**AMERICAN MEDICAL ASSOCIATION,**
**et al., Plaintiffs,**

**v.**

**Otis R. BOWEN, Secretary, United States Department of Health and Human Services, Defendant.**

**Civ. A. No. 3–86–3181–H.**

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 20, 1987.

Jack R. Bierig, Sidley & Austin, Chicago, Ill., and Richard E. Gray, Thompson & Knight, Dallas, Tex., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., Sheila Lieber and Mona S. Butler, Attys., Dept. of Justice, Civil Div., Ronald E. Robertson, General Counsel, Terry Coleman, Deputy General Counsel, Mark H. Gallant, Deputy Associate General Counsel, Tom Coons, Atty., Office of General Counsel, U.S. Dept. of Health and Human Services, Washington, D.C., Marvin Collins, U.S. Atty., and Maryann Moore, Asst. U.S. Atty., N.D. Tex., Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

SANDERS, Acting Chief Judge.

This case, filed December 24, 1986, is before the Court by transfer from the Lubbock Division, United States District Judge Halbert O. Woodward presiding. *See* Order filed December 30, 1986. By Application for Preliminary Injunction, also filed December 24, 1986, Plaintiffs seek relief from certain provisions of § 9331 of the Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509 ("OBRA").[1] Plain-

---

1. On December 30 Judge Woodward, after a conference, granted Plaintiffs' Motion for a

tiffs seek preliminary relief on three counts. In Count I Plaintiff physicians claim that they have a Fifth Amendment right to make an "informed participation decision" and therefore the Defendant Secretary must provide all physicians certain fee information before they can be required to elect whether to "participate" in Part B of Medicare. Plaintiffs say the Secretary's failure to provide this information violates their constitutional right to due process. In Count II Plaintiffs seek to enjoin the Secretary, also on due process grounds, from undertaking statutorily authorized sanction proceedings against physicians for violating the fee limitations of § 9331 of OBRA. In Count III Plaintiffs claim that the Secretary elected a method for determining physician charges without the notice and comment required by the Administrative Procedure Act, necessitating injunctive relief.

An evidentiary hearing on Plaintiffs' Application was held on January 13–14, 1987. Based on the evidence, pleadings, and testimony of record, the Court makes the following Findings of Fact and Conclusions of Law. Any finding may be deemed a conclusion, and any conclusion may be deemed a finding.

### Summary of Court's Ruling

The Court finds no violation of Plaintiffs' federal constitutional rights and no improper action or omission by the Secretary. The provisions of the statute in question (§ 9331) are clear, and the statute is a valid exercise of legislative power. There being no constitutional or administrative infirmity, the Court has neither reason nor authority to suspend the statute or to rewrite it in accordance with Plaintiffs' interpretation. The appropriate forum for Plaintiffs' grievances is the Congress, not the courts.

The preliminary injunction request will be denied.

Temporary Restraining Order ("TRO") and ordered that Defendant Secretary be temporarily restrained from (1) implementing or enforcing certain provisions of § 9331 of OBRA requiring physicians to decide prior to January 1, 1987, whether to participate in Part B of the Medicare Program; (2) initiating or applying sanctions against any physician for any "actual charge"

### Findings of Fact

1. Plaintiff American Medical Association ("AMA"), a non-profit Illinois corporation, is the largest organization of physicians in the United States with about 270,000 members nationwide, approximately 16,000 of whom practice in the State of Texas. Plaintiff Texas Medical Association, a non-profit Texas corporation, is comprised of approximately 26,000 physicians. Plaintiff Lubbock-Crosby-Garza County Medical Society, a non-profit Texas corporation, has as its members many physicians practicing in the Lubbock Division, Northern District of Texas. Plaintiffs Bill J. Johnson, M.D., Richard D. Smith, M.D., Norma Porres, M.D., Ted H. Forsythe, M.D., and David M. Mills, M.D. are physicians licensed to practice in the State of Texas residing in the Northern District of Texas.

2. Defendant Otis R. Bowen is Secretary of the United States Department of Health and Human Services (the "Secretary") and in that capacity is responsible for the implementation of § 9331 of OBRA.

3. OBRA was signed by the President on October 21, 1986. The portions of § 9331 relevant to this lawsuit were to take effect on January 1, 1987.

4. The Medicare Program applies to all persons 65 years of age or over. The Program is divided into two parts. Part A provides insurance for services furnished by hospitals and related post-hospital services. 42 U.S.C. §§ 1395c–1395i. Part B is a voluntary program of supplemental medical insurance for physicians' and other medical services. 42 U.S.C. §§ 1395j–1395w, 1395x(5). This lawsuit involves Part B.

5. Enrollees (beneficiaries) under Part B obtain benefits in return for the payment of monthly premiums, the amount of which is determined by the Secretary and the

above the levels imposed by § 9331; and (3) setting the rate for any physician's services at less than 100% of "prevailing charge" levels imposed by § 9331. See Order filed December 30, 1986; Supplemental Order filed December 31, 1986. This Court on January 7, 1987, extended Judge Woodward's TRO until noon, January 20, 1987.

Congress. 42 U.S.C. § 1395r(a)-(c); 42 U.S.C. § 1395t. These premiums, and contributions from the Federal Government, make up the Federal Supplementary Medical Insurance Trust Fund ("Trust Fund"). Benefits under Part B are paid out of the Trust Fund. *Id.*

6. A beneficiary under Part B may pay for physician services in one of two ways. The beneficiary may pay the physician and then request reimbursement from Medicare. This is an unassigned claim. 42 U.S.C. § 1395u(b)(3)(B)(i). Alternatively, the beneficiary may assign to the physician the beneficiary's right to reimbursement. This is an assigned claim. 42 U.S.C. § 1395u(b)(3)(B)(ii).

Claims are handled and paid by "carriers" designated by the Secretary for geographic locations, *e.g.,* a state. Carriers maintain information about each physician's charges to Part B beneficiaries.

7. For both assigned and unassigned claims Medicare Part B pays 80% of the "reasonable charge" for the physician service, calculated according to a formula set forth in 42 U.S.C. § 1395u(b). The patient is responsible for the remainder of the charge.

8. The "reasonable charge" for a service is the lowest of (1) the physician's "actual charge" billed to the particular patient, (2) the physician's "customary charge" to Medicare beneficiaries for similar services as determined according to a fee profile developed by the local Medicare carrier, or (3) the "prevailing charge recognized by the carrier" for similar services in the locality to Medicare beneficiaries. 42 U.S.C. § 1395u(b)(3). The reasonable charge is usually the prevailing charge.

9. Section 9331(b) of OBRA continues a policy begun October 1, 1984, by the Deficit Reduction Act of 1984, Pub.L. No. 98–369 ("DEFRA"), which required all physicians who treat Medicare patients to elect annually whether to become "participating physicians". 42 U.S.C. § 1395u(h).

The first election under OBRA had to be made by January 1, 1987. The election is irrevocable for one calendar year. The purpose of § 9331 of OBRA is to strengthen the participating physician program and to provide Part B beneficiaries more certainty about their medical costs.

10. Under DEFRA in 1986 most (72%) physicians were non-participating. Testimony of Booth.

11. A "participating physician" is one who treats Part B beneficiaries and agrees to accept payment on the basis of assignment for all items or services furnished to Part B beneficiaries during the 12–month period beginning January 1. § 9331(b). A "participating physician" agrees to accept the "reasonable charge" as his maximum charge. Under § 9331 a "non-participating physician" is one who treats Part B patients but is not obligated to take assignment of Part B claims, *i.e.,* does not agree to accept the "reasonable charge" as his maximum charge in all cases. Patients of non-participating physicians can pay the physician and apply direct to Medicare for their 80% reimbursement of the reasonable charge.

12. Prior to January 1, 1987, and effective October 1, 1984, DEFRA capped the Part B charges of non-participating physicians. The DEFRA cap has been replaced by the § 9331 cap. Under § 9331 non-participating physicians may charge Medicare patients no more than the "maximum allowable actual charge" ("MAAC") for any procedure (during 1987 and subsequent years). A non-participating physician is subject to a MAAC for each service provided by that physician. The MAAC information enables the Secretary to monitor the charges of non-participating physicians to Part B beneficiaries for services furnished after January 1, 1987. § 9331.

13. MAAC information provided after January 1, 1987 is not for the purpose of assisting a physician in the pre-January 1, 1987 participation decision. Section 9331 does not require or even suggest that MAAC information must be provided to a physician before January 1. The statute and the Conference Committee Report both make clear that a physician's decision to participate, which must be made by January 1, 1987, precedes the receipt of MAAC

information. H.R.Rep. No. 99–1012, 99th Cong., 2d Sess. at 331, U.S.Code Cong. & Admin.News 1986, pp. 3607, 3976. Exhibit E to Complaint at 8. MAACs are to be provided after January 1, 1987, *i.e.,* "at the beginning of the year", only to non-participating physicians. § 9331(b)(2). The Conference Committee interpreted this provision to require that MAACs be provided a non-participating physician "no later than March 1 for 1987 and no later than February 1 for subsequent years." This is a reasonable interpretation and is consistent with the statute.

14. Section 9331(c)(i) provides a formula by which a physician's MAAC (for 1987 and subsequent years) for a specific service is determined. The MAAC information is to be furnished by the Medicare carriers. This information is not essential to making an election decision. The Court finds that all doctors can make, to quote Plaintiffs' witness, Dr. Hendler, "crude statistical calculations" of their MAACs. Although it could be difficult and time consuming, doctors can roughly approximate their MAACs from their own billing records, from DEFRA base charge information (and experience), from data available from fellow physicians or from information previously furnished by their carrier. Testimony of Heath, Hendler, Bak, Buckingham, Harris and Booth. Although not all of this information is available to all physicians, no doctor is without at least some means for roughly estimating his 1987 MAAC.

The Court finds that precise MAAC information is not essential for a physician to approximate the financial impact of the participation decision.

15. Section 9331(b)(1)(C)(vi) defines a "physician's actual charge" as "the weighted average (or, at the option of the Secretary for a service furnished in the calendar quarter beginning April 1, 1984, the median) of the physician's charges for such service furnished in the year or other period." A physician's MAAC is calculated based on his "actual charge" during this base period (April-June 1984 quarter). If the physician has no base period charge the MAAC is determined by using the 50th percentile of customary charges for non-participating physicians. OBRA–86, § 9331(b); Declaration of Harris, ¶ 5.

16. On or about November 6, 1986, the Secretary elected to employ the median in determining a physician's "actual charge". Plaintiffs' Exhibits 1–3.

17. Some physicians who requested MAAC information from their carriers received no response prior to January 1, 1987, and others received incomplete information. Plaintiffs have offered evidence that some members of some medical societies did not receive requested MAAC information. The Court is unable to find that these examples are representative or statistically significant; indeed, they appear to be anecdotal. The Court cannot find that a substantial number of physicians requested and did not receive MAAC information before January 1, 1987. Neither can the Court find from the evidence before it that a substantial number of physicians believed that they needed MAAC information before January 1, 1987. In any event, as the Court has previously noted, MAAC information is only required to be made available after January 1, 1987, and is not for the purpose of assisting in a participation decision.

18. Plaintiff physicians claim a constitutional right to an "informed participation decision" and assert that MAAC information is essential to that decision. However, the testimony reflected that a physician's MAAC is only one of several factors which a physician might use to make a participation decision. Among the other factors are (1) a physician's philosophical stance regarding Medicare; (2) the proportion of a physician's patients who are Medicare Part B beneficiaries; (3) a physician's own experience with the Medicare program; and (4) the percentage of a physician's income derived from assignments. Testimony of Zisman, Hendler, Bak, Matthews, Ledner, and Noble. The American Medical *News*, a weekly publication of the Plaintiff AMA, in its lead editorial of December 5, 1986, cited six factors to consider in reaching a participation decision; MAAC information is listed fourth. Defendant's Exhibit J.

Plaintiffs' witnesses testified, in substance, that physicians need MAAC information in order to determine which status, participating or non-participating, will be of more financial benefit to them. But physicians do not know with certainty how many Part B patients they will have in 1987 or how many procedures they will perform in 1987. They can approximate these and, as the Court has noted, they can also approximate the financial impact of participation or non-participation from information now available. The Court is unable to find—would be reluctant to find—that financial benefit is the governing factor in a physician's decision. The Court is unable to discern from the evidence before it that the financial impact of the election on a particular physician is significant or even precisely measurable.

The Court also notes the voluntary nature of Part B; physicians may elect not to be a Medicare provider. The Court further notes, from its colloquy with Plaintiffs' counsel, Mr. Bierig, that there is a subjective aspect to an "informed participation decision"; in other words, it would seem that one physician may need more or less information than another physician to feel "informed". The Court has been unable to locate, and Plaintiffs have not provided, an objective, quantifiable definition of what constitutes an "informed participation decision".

19. Congress provided several incentives to physicians to elect to participate, *i.e.*, to take assignments and accept the reasonable charge as the maximum charge for all Part B claims. The reimbursement claims of participating physicians are supposed to be processed more rapidly. Their claims are all paid by assignment and at 100% of prevailing charge levels. A toll-free telephone number is available for Medicare beneficiaries to obtain "the names, addresses, specialty, and telephone numbers of participating physicians...." 42 U.S.C. § 1395u(h)(2). The Secretary publishes each year and furnishes to interested parties "a directory containing the name, address, and specialty of all participating physicians." 42 U.S.C. § 1395u(i). Ex. D at 2.

20. On November 3, 1986, the Secretary informally sought comments from various professional organizations, including Plaintiff AMA, on a draft "Dear Doctor" letter. The draft letter indicated that in computing the 1987 MAAC, the "actual charge" (which is a component of the MAAC) would be the median charge billed to beneficiaries during the base period April 1–June 30, 1984. Testimony of Harris, Booth. Def. Ex. A. Under DEFRA the "actual charge" component was based on the weighted average of charges during the base period.

Responses were required within 24 hours. Testimony of Blehart. No other notice or comment opportunity was provided.

21. On or about November 6, the Secretary sent to the Medicare carriers the "Dear Doctor" letter and attached materials. Plf. Exs. 1–3. On or about November 15, 1986, the letter was sent by the carriers to each of the nation's approximately 500,-000 physicians. The letter explains the impact of Section 9331, provides an outline of the legislation, and invites physicians to request additional information. Plf. Ex. 1, Harris testimony.

22. A notice and comment period in the 71 days between the October 21, 1986 enactment of OBRA and the January 1, 1987, effective date of § 9331 of OBRA, would not have been practically possible. Testimony of Booth. Section 9331(e) of OBRA specifically excludes from notice and comment those provisions of OBRA which were to take effect within 150 days from the date of enactment.

23. In addition to the November 15 letter from the carriers, physicians received other notice of § 9331. On at least four occasions before mid-December Plaintiff AMA's American Medical *News* contained articles about the impact of § 9331. Testimony of Blehart, Def. Ex. K. Some state and local medical societies notified their members. Def. Ex. K, L. Some accountants and business advisors notified their physician clients. Testimony of Bak, Buckingham. The AMA did not send letters to its members. Testimony of Blehart.

24. The Secretary, through the Health Care Financing Administration, instructed Medicare carriers in November 1986 to "[a]nswer mail or telephone requests for charge data from physicians and suppliers within three working days." Plf. Ex. 3 at 6. Section 9331 does not require this; the Secretary's action was an effort to be helpful to physicians.

25. At its convention in Las Vegas held December 7–10, 1986, the AMA House of Delegates resolved to take "whatever steps are necessary" to enjoin implementation of § 9331. Def. Ex. L.

26. The Texas Medicare carrier was inundated in latter December 1986 by physician requests for MAAC information. The Court is unable to determine whether the relatively large number of late requests is due to a tendency, not peculiar to physicians, to wait until the last minute, or was a planned tactic to demonstrate that MAAC information was not quickly available, despite the Secretary's instructions to the carriers. The Texas carrier has now responded to all pre-January 1 requests. Testimony of Harvey, Def. Ex. E.

27. With MAAC information the Secretary can monitor physicians' charges to determine if beneficiaries are being subjected to excessive charges over a calendar year. Section 9331 provides:

> If such [non-participating] physician *knowingly and willfully* bills for such service a physician's actual charge (as defined in subparagraph (C)(vi)) in excess of the maximum allowable actual charge determined under subparagraph (C) for that service, the Secretary *may* apply sanctions against such physician.... (emphasis added).

Sanctions may include disbarment from Medicare for up to five years and imposition of monetary penalties of up to $2,000 per violation. 42 U.S.C. §§ 1320a–7a.

28. Nonparticipating physicians are not bound to a single actual charge in 1987 at or below the MAAC. The physician may bill charges above the MAAC provided that there are enough offsetting charges below that level so that the average of actual charges made during the year does not exceed the MAAC. *Id.;* Plf. Ex. 1 at 1.

29. Prior to formal sanctions action, a physician will be advised that his charges appear to be in excess of the MAAC, and he will be given an opportunity to resolve the matter with the Medicare carrier. Only if informal attempts prove unsuccessful, will formal proceedings be instituted, to be conducted pursuant to administrative hearing and judicial review provisions. 42 U.S.C. §§ 1320a–7a(b), (d); 42 U.S.C. § 1395y(d)(3).

30. No Plaintiff has been threatened with sanctions under OBRA. Indeed, under DEFRA (in effect since October 1, 1984) only 38 cases have been referred to the Inspector General for sanctions proceedings, and only one physician has been sanctioned. Testimony of Harris. The Court finds that the threat of sanctions is remote and, in any case, not irreparable.

31. Under § 9331 reimbursement to non-participating physicians is 96% of the reimbursement to participating physicians. The purpose of this disparity is to encourage physicians to participate. The December 30 Temporary Restraining Order enjoined this provision. The inability to impose this 4% reimbursement differential is costing the Defendant $1.5–million per working day since January 1, 1987. Testimony of Booth, Affidavit of Desmarais at ¶ 7.

32. Defendant's evidence established that the Secretary has published notice in the *Federal Register* that non-participating physicians will be subject to sanctions only if both their weighted average and their median charges for 1987 exceed their MAACs. Consequently, the Secretary's election to use the median in computing actual charge, rather than the weighted average as used prior to § 9331, will not adversely affect physicians by increasing their exposure to sanctions. It follows that the Secretary's election, mandated by § 9331(b), does not injure Plaintiffs.

### Conclusions of Law

1. This Court has jurisdiction over the subject matter and over the parties, and

venue is proper in the Northern District of Texas.

2. To secure a preliminary injunction the movant has the burden of proving four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the preliminary relief is not granted; (3) that the threatened injury to the movant outweighs any damage preliminary relief might cause to the opponent; and (4) that the relief sought will not disserve the public interest. *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir.1985). The decision to grant preliminary relief is the exception rather than the rule. *Mississippi Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985).

The Court will address these elements *seriatim*.

**I. Substantial Likelihood of Success on the Merits.** The Court concludes that Plaintiffs have not established a substantial likelihood of success on the merits because (a) Plaintiffs have not shown a constitutionally protected right entitling them to claim a due process violation, (b) even if a constitutionally protected interest were implicated, there is no actual or threatened violation of due process, and (c) Plaintiffs have shown no violation of the Administrative Procedure Act.

3. In order to establish their Counts I and II claims of denial of due process Plaintiffs must first demonstrate "a legitimate claim of entitlement" to a liberty or property interest. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); U.S. Const. Amend. V. Plaintiffs have not done so.

■ 4. Plaintiffs claim to enjoy a due process right to make an informed participation decision. That right, if it exists, is not constitutionally substantive. Property interests are not constitutionally created; they flow from independent sources, for example, state law. *Id.* "The Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures.... 'Proper-

ty' cannot be defined by the procedures provided for its deprivation...." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); *Levitt v. University of Texas at El Paso*, 759 F.2d 1224, 1232 (5th Cir.1985).

Physicians are not required to treat Medicare patients. "It is well established that government price regulation does not constitute a taking of property where the regulated group is not required to participate in the regulated industry". *Whitney v. Heckler*, 780 F.2d 963, 972 (11th Cir. 1986) (ruling that the 1984 Medicare fee freeze provisions of DEFRA were consistent with due process) (*citing Bowles v. Willingham*, 321 U.S. 503, 517–18, 64 S.Ct. 641, 648–49, 88 L.Ed. 892 (1944) (rent control); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dept. of Public Welfare*, 742 F.2d 442, 446 (8th Cir.1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985) (upholding statute limiting fees of nursing homes to non-Medicaid patients). *See AMA v. Heckler*, No. IP 84–1317–C, slip op. at 13–14 (S.D. Ind. Oct. 11, 1984) (unpublished); *Private Medical Care Foundation v. Bowen*, No. CIV–84–2275–W, slip op. at 11–13 (W.D. Okla. May 30, 1986) (unpublished) [Available on WESTLAW, DCT database].

■ 5. Even if Plaintiffs had demonstrated a "legitimate claim of entitlement" as to Count I, they have failed to establish a due process violation in not being provided MAAC information prior to the date of their participation decision. *See AMA v. Heckler*, 606 F.Supp. 1422 (S.D.Ind.1985), *Private Medical Care Foundation, supra*, at 13–14. Congress required that MAAC information be provided after the participation decision. Physicians are able, imprecisely but sufficiently, to estimate their MAACs (maximum allowable actual charges). These estimates, along with other already mentioned factors, suffice for an informed participation decision. Lack of complete and precise fee information does not rise to the level of a due process violation. *Private Care Foundation, supra*, at 11.

■ 6. The sanctions issue raised in Count II is not ripe for judicial decision. To determine whether an issue is ripe for judicial review a court must evaluate both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Pennzoil v. FERC*, 645 F.2d 394, 398 (5th Cir.1981). Plaintiffs have alleged a purely speculative injury, *viz.*, the possibility that sanctions will be imposed simply for exceeding the MAAC limit prior to receiving the MAAC information from Defendant. The mere possibility of later harm does not make a statute ripe for pre-enforcement review. *Toilet Goods Ass'n. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Alascom, Inc. v. FCC*, 727 F.2d 1212, 1217 (D.C.Cir.1984).

■ 7. Even if the sanctions claim were ripe, the Court concludes that constitutional requirements of due process are satisfied by the sanctions procedure of § 9331 and the opportunities provided for hearing and for judicial review. The statute states that only if a non-participating physician "knowingly and willfully" bills more than his MAAC "may" the Secretary apply sanctions. The overbilling which might trigger sanctions will be determined by the billing for the entire 12–month period of 1987, thus allowing non-participating physicians (of course, participating physicians are not concerned with MAAC information) to remedy unwitting overcharges made prior to receiving their MAACs. Testimony of Harris.

■ 8. Turning to Plaintiffs' Count III claim (violation of the Administrative Procedure Act ("APA")), the statute (OBRA § 9331(b)) explicitly requires the Secretary to elect to employ either the "weighted average" or the "median" of a physician's charges to derive a physician's "actual charge". The Secretary elected to employ the median. *See* "Dear Doctor" letter of November 6, 1986, Plf. Ex. 1. For that decision to be subject to the "rule-making" procedures of the APA, *see* 5 U.S.C. § 513, Plaintiffs must first show that the Secretary's choice is a "rule" within the meaning of 5 U.S.C. § 551(4) which provides in relevant part:

(4) 'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy....

9. The Court concludes that the Secretary's choice was not a rule within the ambit of the APA. *See Western Coal Traffic League v. U.S.*, 694 F.2d 378, 392 (5th Cir.1982), *vacated in part on other grounds en banc*, 719 F.2d 772 (1983), *cert. denied*, 466 U.S. 953, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984); *AMA v. Heckler*, 606 F.Supp. at 1438. Section 9331(b) plainly requires a choice between two congressionally prescribed alternatives and, contrary to Plaintiffs' contention, does not afford the Secretary "an array of choices". Plaintiffs' Supplemental Memorandum at 8. Plaintiffs' claim that APA procedures attach to the Secretary's choice ignores the purpose of APA rule-making procedures, *viz.*, that an agency charged by Congress with discretionary power to develop legislative directives obtain public insight as part of the formulation of those directives. 5 U.S.C. § 553; *Pacific Gas & Electric Co. v. Federal Power Com'n.*, 506 F.2d 33, 37 (D.C.Cir.1974). Here, the Secretary did not develop a legislative directive.

10. The APA's notice and comment provision applies only to legislative not interpretative rules. 5 U.S.C. § 553(b)(A). *AMA v. Heckler*, 606 F.Supp. at 1438; *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir.1983).

11. A legislative rule is a rule promulgated by an agency pursuant to statutory authority with the intent "to create new law, rights or duties", *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561 (D.C. Cir.1984); *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977), by imposing "extra-statutory obligations". *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir.1984). An interpretative rule is a rule issued by an agency to inform the public of the statutes or regulations the agency administers. *See Energy Consum-*

*ers v. Dept. of Energy*, 632 F.2d 129, 140 (Temp.Emer.Ct.App.1980), *cert. denied*, 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980). "An interpretative rule simply states what the administrative agency thinks the statute means, and only ' "reminds" affected parties of existing duties.' " *General Motors, supra*, 742 F.2d at 1565 (*quoting Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 & n. 153 (D.C.Cir.1979)).

12. The Court concludes that even if the Secretary's choice of median charge were a rule, it was an interpretative rule. The Secretary's actions did not "create new law, rights or duties". Simply put, as has been written in response to a nearly identical claim by the AMA, "not every agency pronouncement is a legislative rule." *AMA v. Heckler*, 606 F.Supp. at 1440.

13. Even if the Secretary's choice were a legislative rule, it is exempt from the notice and comment provisions. Under 5 U.S.C. § 553(b)(B), a notice and comment period for legislative rules is not required

> When the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedures are impracticable, unnecessary, or contrary to the public interest.

The Secretary had good cause to find the APA rule-making procedure "impracticable". OBRA was signed by the President on October 21, 1986. The portions here at issue were to take effect January 1, 1987— 71 days later. Time was of the essence. Because 9331(e) specifically excludes from notice and comment those provisions of OBRA taking effect less than 150 days from enactment, the Secretary had good cause to find the APA procedures "unnecessary". While Plaintiffs are correct that the Secretary never incorporated "a brief statement of reasons" into the Dear Doctor letter, the reasons for not requiring notice and comment are plain. "Any violation of [the APA's procedural requirements] in these circumstances would be hypertechnical". *Yassini v. Crosland*, 618 F.2d 1356, 1362 (9th Cir.1980).

**II. Irreparable Injury.** The Court concludes that Plaintiffs did not establish a substantial threat of irreparable injury if the preliminary relief is not granted.

14. Plaintiffs have only shown some possible financial impact from the participation decision. Such speculative monetary harm is insufficient to support a preliminary injunction. *See Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir.1981), *reh. denied*, 641 F.2d 879; *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir.1975), *reh. denied*, 522 F.2d 1280. Even if this were a legal "harm", it is not irreparable. It would be legally possible, though administratively difficult, later to remedy any monetary losses Plaintiffs have sustained, should they prevail on the merits. Testimony of Booth.

**III. Balancing of Harms.** It was not established that the threatened injury to Plaintiffs outweighs the damage a preliminary relief might cause to Defendant.

15. Balanced against Plaintiffs' speculative monetary injury is proven substantial financial harm to the government. Delay in implementing § 9331(a)(1)'s 4% prevailing charge differential is costing the Medicare Trust Fund $1.5 million per working day. Testimony of Booth, Affidavit of Desmarais at ¶ 7. Preliminary relief would frustrate implementation of a duly enacted statute and is therefore harmful to Defendant. *See Heckler v. Redbud Hospital District*, 473 U.S. 1308, 106 S.Ct. 1, 87 L.Ed.2d 677 (1985) (Rehnquist, J.); *Heckler v. Lopez*, 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1983). Preliminary relief would disrupt the administrative process and that is also harmful to Defendant. *See Sampson v. Murray*, 415 U.S. 61, 83, 94 S.Ct. 937, 949, 39 L.Ed.2d 166 (1974). Absent constitutional considerations, and the Court has found none, the Court finds no threatened injury to Plaintiffs which outweighs these harms to Defendant.

**IV. Public Interest.** Plaintiffs did not establish that the relief they seek would serve the public interest. The Court concludes that granting the relief sought would adversely affect the public interest.

16. Plaintiffs have not demonstrated how the public interest would be served by the preliminary relief they seek. Conversely, OBRA is clearly rationally related to a legitimate government function—that of expanding the participating physician program and providing Medicare Part B beneficiaries greater certainty about physician fee levels. *See National R.R. Corp. v. Atchison, Topeka Co.*, 470 U.S. 451, 105 S.Ct. 1441, 1457, 84 L.Ed.2d 432 (1985) ("Under the Fifth Amendment's Due Process Clause, Congress remained free to 'adjust the burdens and benefits of economic life,' as long as it did so in a manner that was neither arbitrary nor irrational. [citations omitted]"). The Court cannot conclude that Congress acted arbitrarily or irrationally in passing § 9331. It would not serve the public interest to grant the preliminary injunction and thereby to suspend the operation of a valid statute.

The Court further concludes that delay in the participation decision-making process, with its consequent financial cost to the Medicare program, *see supra*, is contrary to the public interest.

Since Plaintiffs have failed to establish any of the four prerequisites for a preliminary injunction, the Application for Preliminary Injunction is DENIED, and the previously issued Temporary Restraining Order is DISSOLVED.

SO ORDERED.