**AMERICAN SOCIETY OF CATARACT AND REFRACTIVE SURGERY, et al., Plaintiffs,**

**v.**

**Otis R. BOWEN, M.D.,**

**and**

**William M. Roper, M.D., Defendants.**

**Civ. A. No. 86–3339 SSH.**

United States District Court, District of Columbia.

Nov. 28, 1989.

Jerald A. Jacobs, Washington, D.C., for plaintiffs.

Sheila Lieber, Vaughan Finn, Dept. of Justice, Civil Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

STANLEY S. HARRIS, District Judge.

In December 1986, the American Society of Cataract and Refractive Surgery filed a complaint challenging the constitutionality of the Omnibus Budget Reconciliation Act of 1986, P.L. 99–509, which places limits on the amounts physicians may charge Medicare patients for the performance of cataract surgery. The complaint was amended in February to include several doctors and patients who claimed direct injury from the statute.[1] Defendants filed a motion for judgment on the pleadings and for dismissal. Upon consideration of defendants' motion, plaintiffs' opposition thereto, defendants' reply, and the entire record herein, defendants' motion is granted.

## BACKGROUND

The Health Insurance for the Aged Act, 42 U.S.C. § 1395 *et seq.*, commonly known as Medicare, consists of two parts: Part A covers services furnished by hospitals and other related providers; Part B provides supplemental medical insurance benefits, including physicians' services. 42 U.S.C. §§ 1395 *et seq.* The statutes in question in this suit involve only Part B.

Medicare allows individuals over 65 to pay monthly premiums into a trust fund which is supplemented by contributions from the federal government.[2] Beneficiaries then have two ways to pay for a physician's services rendered under Part B: (1) they can either pay the physician directly and then seek reimbursement from Medicare;[3] or (2) they can allow the physician to accept the beneficiary's right to reimbursement.[4] The amount of reimbursement is based on the "reasonable charge" for the service. The reasonable charge is determined by the lowest of three charges: (1) the physician's actual charge for the service; (2) the physician's customary charge for the service; or (3) the prevailing charge for the service according to a fee profile developed by the local Medicare insurance carrier. 42 U.S.C. § 1395u(b)(3).

Because the Medicare beneficiary may either assign his claim or pay the physician directly, Medicare provides physicians with two options. They may become a "partici-

---

1. The American Academy of Ophthalmology, Inc., (AAO) has intervened as a plaintiff in this case; however, since plaintiffs incorporated AAO's arguments into their responding briefs and oppositions, no additional briefs were filed by the AAO.

2. The premiums and the government's supplements are then pooled in a trust fund which is used to pay for the benefits. The actual paperwork is done by local insurance carriers at the direction of the Secretary. The Secretary contracts with insurance carriers to process the claims for reimbursement and maintain records as to physicians' charges.

3. 42 U.S.C. § 1395u(b)(3)(B)(i).

4. 42 U.S.C. § 1395u(b)(3)(B)(ii). If a physician accepts a beneficiary's assignment of Medicare benefits, "the physician agrees to accept the established Medicare reasonable charge as full payment for all covered services provided to Medicare beneficiaries." *See* Original Complaint at 6. The beneficiary then pays 20 percent of the reasonable charge and Medicare pays the physician 80 percent of the reasonable charge. *Id.*

pating physician," or they may remain a "non-participating physician." Participating physicians agree to accept assignment from the Medicare beneficiary and to limit their fees to the established Medicare reasonable charge. Non-participating physicians originally remained free to chose to accept assignment on a case-by-case basis, and also to charge an amount greater than the Medicare reasonable charge.[5] However, in 1984, Congress passed the Deficit Reduction Act, P.L. 98–369 (DEFRA) which included a cost-control statute which required physicians to decide each year whether they would be Medicare "participating" or "non-participating" physicians. DEFRA (P.L. No. 98–369; 98 Stat. 1071, § 2306(c) (1984).) DEFRA froze the fees that non-participating physicians could charge Medicare beneficiaries and provided for sanctions against any physician who "knowingly and willfully" billed an amount in excess of that level. 42 U.S.C. § 1395u(j)(1)(A) (Supp.1989). The Omnibus Budget Reconciliation Act of 1986, P.L. 99–509 (OBRA–86), lifted the DEFRA fee freeze, but replaced it with other limitations on what physicians may charge Medicare beneficiaries.[6] *See* OBRA–86 § 9331, codified at 42 U.S.C. § 1395u(b)(4)(A) (hereinafter § 9331). Generally, it imposed limits in the form of a maximum allowable charge (MAAC) on what physicians may charge their Medicare patients. § 9331(b).

Because of a specific concern over the cost of cataract surgery, Congress enacted § 9334 which addresses payment for cataract surgical procedures. OBRA–86, § 9334, codified at 42 U.S.C. § 1395u(b)(11), (hereinafter § 9334). Section 9334(a)(3) limits the amount both participating and non-participating physicians may charge Medicare patients for cataract surgical procedures.[7] Plaintiffs allege that this statute and HHS's interpretation of the interaction between § 9334 and § 9331 are unconstitutional.

## DISCUSSION

In challenging the reductions, plaintiffs make several allegations. First, plaintiffs state that Congress lacks the authority to regulate private financial arrangements between a physician and a patient. Second, plaintiffs contend that the fee restriction are arbitrary and irrational and thus are in violation of their due process rights. Third, plaintiffs claim that the restrictions violate the equal protection clauses of both the 5th and 14th Amendments by irrationally singling out physicians who perform cataract surgery and significantly impairing patients' freedom to choose and pay for quality medical care. Fourth, plaintiffs dispute the HHS's interpretation to two provisions of OBRA–86, sections 9334 and 9331, claiming that HHS's interpretation results in two separate and inconsistent fee limitations and violates the mandatory notice and comment requirements of the Administrative Procedure Act (APA). The Court will address the constitutional claims

---

5. Prior to 1984, all physicians were permitted to decide on a claim-by-claim basis whether or not they wanted to accept assignment. *Defendants' Memorandum In Support of Motion for Judgment on the Pleadings and To Dismiss* at 4. (Hereinafter Defendants' Motion.) If the physician did not accept assignment, Medicare would pay the set reasonable charge and the beneficiary would be responsible for the difference between the actual charge and the amount paid by Medicare.

6. Section 9331 imposes limits in the form of a maximum allowable charge calculated on the basis of pre-DEFRA charges and certain statutory formulas. H.Rep. No. 99–727, 99th Cong.2d Sess., at 91, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3607, 3681.

7. The statute primarily limits the fees in two ways. First, in 1987 it reduced "prevailing

charge" for cataract procedures by 10 percent, and then it reduced the "prevailing charge" by an additional two percent in 1988. Second, it set a floor for the reductions, providing that the new prevailing charge in a locality for a given procedure may not be less than 75 percent of the 1986 weighted national average for that procedure. (Defendants' Motion at 10). This affects non-participating physicians in that in 1987 they could only charge a beneficiary up to 125 percent of the prevailing charge after the 10 percent reduction, plus one-half of the difference between the physician's average charges in 1986 and 125 percent of the prevailing charge. After 1987, non-participating physicians could only charge up to 125 percent of the prevailing charge. (Defendants' Motion at 10, fn. 4.) *See* § 9334.

first, and then the claims based on the APA.

## STANDING

■ Before reaching the merits of the case, the issue of standing must be addressed. The defendants claim that the patient plaintiffs do not satisfy the "irreducible minimum" requirement set forth in *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Defendants claim that the patient plaintiffs have not alleged any actual or threatened injury which can be fairly traced to the actions of defendants. Defendants further claim the patient plaintiffs' only damage is being prevented from paying higher costs for the same medical care. (Defendants' Motion at 13). Defendants, however, are missing the more crucial injury that patient plaintiffs suffer—foregoing all Medicare benefits in exchange for care from a physician of their choice. In essence, the patient is denied access to a physician of his or her choice if that doctor refuses to treat Medicare patients because of the fee limitations. As the Court of Appeals for this Circuit pointed out in *New York State Ophthalmological Society v. Bowen*, 854 F.2d 1379, 1385 (D.C.Cir.), *reh'g denied en banc*, 861 F.2d 1283 (D.C.Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989), "a provision that, as a practical matter, conditions access to a desired service or exemption from an approval requirement on a patient's 'voluntary' decision to give up a valuable benefit is tantamount to a direct penalty imposed on the patient who chooses the service."

■ Defendants also claim the physician plaintiffs do not have standing. Defendants contend that if physicians choose to forego expensive state of the art equipment then that decision is discretionary and too attenuated to establish standing. However, defendants go on to cite legislative history which shows that part of the purpose of the OBRA–86 restrictions is to single out "exactly these sorts of purchases as examples of the wasteful purposes to which funds were being put...." Defendants' Motion at 15. Thus, while defendants call the injuries speculative and attenuated, it appears that Congress intended just such injuries and reactions among cataract physicians. Given such a direct relationship and the actual injury alleged in the amended complaint, the Court declines to accept the defendants' argument that plaintiffs do not have standing to challenge the statutory provisions.

## CONSTITUTIONAL CLAIMS

Essentially, plaintiffs' first three claims focus on the constitutionality of Congress's actions. They claim Congress does not have the authority to regulate private financial arraignments between doctors and patients, and that even if Congress did, Congress's limitations on what non-participating physicians may charge Medicare patients is irrational and violates both the physicians' and patients' equal protection rights.

### A. Congressional Authority

■ Plaintiffs first allege that Congress lacks the authority to regulate the fees that non-participating physicians may charge because the fee limitations are not valid exercises of Congress's authority to spend money in aid of the general welfare. Plaintiffs contend that the fee limitations do not implicate any expenditure of funds by the federal government. Lacking such expenditure of federal funds, plaintiffs allege that the General Welfare Clause, Art. I, § 8, cl. 1, does not give Congress authority to regulate the non-participating physicians' fees. (Plaintiffs' Opposition at 13.) Plaintiffs take the position that since the "[c]harges of nonparticipating physicians, and the entitlement of those physicians to payment from their patients, are independent from the operation of the Medicare program," then the amount that non-participating physicians charge Medicare beneficiaries is also independent of Congress's funding of Medicare, and thus outside of the scope of the General Welfare Clause. (Plaintiffs' Opposition at 11.) The Court disagrees with this rationale. As defen-

dants point out in their Reply Brief in Support of Motion for Judgment on the Pleadings and To Dismiss (Defendants' Reply), the actions of non-participating physicians are not truly independent of the Medicare program since by treating Medicare patients, non-participating physicians are an integral part of the workings and functioning of the Medicare system. (Defendants' Reply at 5.) Although Medicare patients of non-participating physicians directly receive the funding from the government for their eye care, the non-participating physicians are ultimately the recipients of that federal funding. In addition, not only is cataract surgery the most common and most rapidly growing surgical procedure covered by Medicare, it is also a procedure that is performed predominantly on Medicare beneficiaries.[8] Legislative History P.L. 99–509, at 88, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3607, 3678. Studies have shown that over 80 percent of all cataract surgeries are performed on Medicare beneficiaries. *Id.* at 89, U.S.Code at 3679. If Congress only limited what participating physicians could charge patients, then there would be little incentive to remain a participating physician, unless the reimbursement level was increased. Therefore the expenditure of federal funds is closely linked to the rates charged by non-participating physicians, and clearly authorized under the General Welfare Clause. Accordingly, the Court rejects plaintiffs' claim that the regulations are unconstitutional because they overstep Congress's authority.

### B. Due Process Claim

■ Plaintiffs' second claim—that the restrictions on what non-participating physicians may charge for cataract procedures violate their due process rights—is based on the allegation that "the regulation of private professional fees by the federal government is permissible only if some impropriety or abuse in the setting of fees is found, or if some established need is present." (Plaintiff's Opposition at 2.)

Plaintiffs contend that there is no legislative history which supports the restrictions, and thus those restrictions are arbitrary and irrational. Plaintiffs allege that the fee limitations are irrational because: (1) They fail to consider the experience or expertise of the physician; (2) the limitations are based on arbitrary figures without legislative explanation; and (3) there is no legitimate support in the legislative history for the cataract surgery fee restrictions.

■ Essentially, plaintiffs' argue that the limits were not fully discussed or thought out and, as a result, Congress did not regulate in the most effective or fair manner. However, Congress is not required to enact the best law, but only to enact laws which are rationally related to goals espoused. *See, e.g., Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955) (stating: "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."). While plaintiffs correctly show that certain aspects of the problem, such as expertise, were not explicitly addressed in the limitations, plaintiffs fail to demonstrate that the limitations are irrational or arbitrary. It is clear that courts may not use the Due Process Clause to hold laws unconstitutional when they believe that the legislature has acted unwisely. *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963). The Supreme Court has stated that courts are not to "substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Id.* 83 S.Ct. at 1031.

Furthermore, the rights to contract and to conduct business are not absolute:

[T]he guaranty of due process ... demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a

---

**8.** In 1985 over one million cataract operations were performed on Medicare beneficiaries. Legislative History P.L. 99–509, p. 88, *reprinted* *in* 1986 U.S.Code Cong. & Admin.News 3607, 3678.

real and substantial relation to the object sought to be attained.

*Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 510–11, 78 L.Ed. 940 (1934). It is "'well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.'"

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976)) (citations omitted). Plaintiffs have failed to show that the laws are irrational. At best, plaintiffs have shown that some elements were not given the consideration they felt would have been appropriate. Accordingly, the Court finds that the regulation is rational and rejects plaintiffs' due process claims.

### C. Equal Protection

Third, plaintiffs claim that Congress acted unconstitutionally in regulating the amount non-participating physicians may charge Medicare patients, violating patients' and physicians' equal protection rights. Defendants, in their motion to dismiss, allege that § 9334 violates neither the patients' nor the physicians' equal protection rights.

### 1. Standard of Review

Defendants argue that the proper standard of review is the more lenient rational relationship test and that under that test § 9334 is constitutional. Plaintiffs content that the proper standard of review is strict scrutiny. However, plaintiffs argue that even if the rational relationship test is used, § 9334 is irrational and thus unconstitutional.

■ The Supreme Court has made it clear that "equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 2563, 2566, 49 L.Ed.2d 520 (1976); *see also, City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (stating that "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines...."). In defining a suspect class, the Supreme Court observed that such a class is one that is "'saddled with such disabilities or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Massachusetts Board of Retirement v. Murgia*, 96 S.Ct. at 2567, citing *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). Plaintiffs admit that classifications affecting the elderly only are subject to a rational basis test, rather than strict scrutiny under the equal protection clause. (Plaintiffs' Reply at 44.) *See Massachusetts Board of Retirement v. Murgia*, 96 S.Ct. at 2566. Moreover, based on such an analysis the Court could not conclude that ophthalmologists are a suspect class. Since none of the plaintiffs constitutes a "suspect class," the appropriate standard for review is the more lenient rational relationship test unless a fundamental right is involved.

Plaintiffs argue that a fundamental right is involved and that the Court should submit the statute to a stricter scrutiny. They contend that the right of an individual to make decisions about medical treatment is a recognized constitutional right. Plaintiffs rely upon Supreme Court precedent focusing on *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and its progeny. However, this Circuit expressly declined to accept this line of argument in a similar case, *New York State Ophthalmological Society v. Bowen*, 854 F.2d at 1389, stating:

[w]e disagree that the constitutional right to privacy comprehensively protects all choices made by patients and their physicians or subjects to "strict scrutiny" all government interference with choice of medical treatment. There is no basis under current privacy case law for extending such stringent protection to every decision bearing, however indirectly, on a person's health and physical well-being.

While decisively stating that "there is no basis for demanding strict scrutiny for every government measure involving interference with the body," the Court of Appeals did not rule out that "a particular medical decision with regard to eyesight may ... be entitled to constitutional privacy protection." *Id.* at 1391. However, the "prerequisite to a successful privacy claim would be a definite showing of medical necessity and the unavailability of equally effective alternative therapy." *Id.*

Nowhere in their complaint do plaintiffs allege that there is a medical necessity inherent in the decision to pay a doctor more than the amount prescribed by Medicare. They do not claim that plaintiff patients would not receive care or would receive inadequate care; they allege instead that patients might receive a lower quality of care.

Moreover, while plaintiffs allege that some surgeons have "been forced to cancel or delay the purchase of sophisticated new equipment, the expansion of office facilities, and the opening of ambulatory surgical centers," plaintiffs fail to show the unavailability of equally effective alternative therapy. (Amended Complaint at 3.) Plaintiffs acknowledge that "certain specialized services may not be deemed by some to be 'essential' ". (Amended Complaint at 4.) Furthermore, nothing in plaintiffs' claims demonstrate that "the challenged regulation restricts access to treatment indispensable to a patient's life, health, or sight in a way that 'shocks the conscience.'" *Id.* at 1388, citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Therefore, plaintiffs fail to justify the application of a strict scrutiny test. The applicable standard for review is a rational basis test.

### 2. Application of the Rational Basis Standard

Decisions which do not affect fundamental rights or involve suspect classifications are presumed constitutional. *City of New Orleans v. Dukes,* 96 S.Ct. at 2517; *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1933). Courts have applied the rational relationship test in considering comparable Medicare legislation challenged on equal protection grounds, and have upheld the legislation. *See, e.g., New York State Ophthalmological Soc'y v. Bowen,* 854 F.2d 1379; *Whitney v. Heckler,* 780 F.2d 963 (11th Cir.), *cert. denied, Whitney v. Bowen,* 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Public Welfare,* 742 F.2d 442 (8th Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); *American Medical Ass'n v. Bowen,* 659 F.Supp. 1143 (N.D.Tex.1987), *vacated on other grounds,* 857 F.2d 267 (5th Cir.1988); *Massachusetts Medical Society v. Dukakis,* 637 F.Supp. 684 (D.Mass.1986), *aff'd* 815 F.2d 790 (1st Cir.1987), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987); *Private Medical Care Foundation v. Bowen,* Civ. No. 84–2275 W, 1986 WL 15641 (W.D.Okla., May 30, 1986); *American Medical Ass'n v. Heckler,* 606 F.Supp. 1422 (S.D.Ind.1985).

In addition, courts have upheld legislation which controls price. *See, e.g., Nebbia v. New York,* 54 S.Ct. at 514 (stating: "The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago.").

■ In reviewing the legislative history, the Court finds that Congress acted rationally in enacting the fee limitations. Concern over the growing cost of cataract surgery is well documented. *See, e.g., Medi-*

*care Cataract Implant Surgery*, National Program Inspection, Office of Inspector General, HHS, 51 Fed.Reg. 29321, 29322 (August 15, 1986); Office of Inspector General, Office of Audit, Department of Health and Human Services, *Review of Medicare Payments of Assistant Surgeon Services During Cataract Surgery*, 6 (1985). Congress focused on cataract surgery because studies showed that cataract surgery was overpriced in relation to other surgical procedures without sufficient justification or reason. An estimated one million cataract removals are performed annually, most of which are on elderly patients enrolled in Medicare. It is estimated that 90 percent of Medicare reimbursement costs for eye surgery in 1983 were related to cataract surgery. *See New York State Ophthalmological Society*, 854 F.2d at 1381. In 1986, it was reported that the Medicare program and its beneficiaries were paying "at least" $500 million more than necessary for cataract surgeries each year. *Medicare Cataract Implant Surgery*, at 2.

Entwined with Congress's concern over the excessive and growing cost of cataract surgery was the concern that costs were being passed on to elderly Medicare beneficiaries in direct contradiction to the purposes of the limits and of Medicare.[9] *See* 130 Cong.Rec.S. 8375, June 27, 1984, *reprinted in* 1984 U.S.Code Cong. & Admin. News 697, 1445, 2156; H.Rep. No. 99–727, 99th Cong., 2d Sess. 87, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3607, 3677; H.R.Rep. No. 241, 99th Cong., 2d Sess. 42 (1986) U.S.Code Cong. & Admin.News 1986, pp. 42, 576, 620 (bill authorizes sanctions to "ensure that beneficiaries are protected from additional out-of-pocket costs"); 131 Cong.Rec. 29,831 (1985) (remarks of Calif. Rep. Waxman describing a bill to "reduce Medicare and Medicaid outlays without harming program beneficiaries") (quoted in *New York State Ophthalmological Society*, 854 F.2d at 1382); 131 Cong.Rec. 29,833 (remarks of Fla. Rep. Bilirakis stating that Congress

made tough choices and defeated bills allowing physicians to raise fees and pass this increase on to those least able to afford it); 131 Cong.Rec. 29,834 (comments of Conn. Rep. Kennelly expressing opposition to increased out-of-pocket expenses born by senior citizens.)

Congress addressed several methods of cost containment in the area, such as placing limits on charges for cataract extractions with intraocular lens implants, 51 Fed.Reg. 29321 (Aug. 15, 1986); limiting assisting cataract surgeons absent approval by an insurance carrier or designated state Peer Review Organization, 42 U.S.C. § 1359u(k)(1) and (2); and limiting payment for outpatient lens implantation procedures, H.R. 3061, 99th Cong., 1st Sess. (1985).

The price containments enacted were one step taken in combatting the cost of cataract procedures and in reining in the Medicare budget. While the Court may question the wisdom of legislative limits which do not take into account the expertise of the physician, the Court recognizes that Congress does not have a legislative duty to pick the least restrictive means of accomplishing a goal as long as the means are rationally related to the goal. *See Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) ("reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."). *See also Corr–Williams Wholesale Co. v. Stacy Williams Co.*, 622 F.Supp. 156, 158–159 (S.D.Miss. 1985).

Thus, the Court finds that limitations on what non-participating physicians may charge Medicare beneficiaries is rationally related to Congress's express concerns over the excessive costs of cataract surgery and Congress's desire to avoid shifting the burden to Medicare beneficiaries. Accordingly, the Court rejects plaintiffs' equal protection claim.

---

9. Congress created Medicare to "contribute toward making economic security in old age more realistic, a more nearly attainable goal for most Americans." S.Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.Code Cong. & Admin.News 1943, 1964. See Defendants' Motion at 18.

## ADMINISTRATIVE PROCEDURE ACT CLAIMS

Plaintiffs have alleged that the HHS acted unlawfully in applying both the specific cataract surgery fee caps of § 9334(a)(3) and the general fee limitations set forth in § 9331(b). Section 9331 of OBRA–86 replaced the fee freeze established by § 2306(c) of DEFRA.[10] Under § 9331, non-participating physicians may charge Medicare patients no more than the "maximum allowable actual charge" (MAAC) for any procedure or service. The MAAC amount is determined by a complicated formula set forth in § 9331(c)(i), 42 U.S.C. § 1395u(j)(1)(C).

Section 9334(a)(3) addresses cataract surgeons directly. It requires that the "prevailing charge" for cataract surgery be reduced by 10 percent in 1987 and by an additional two percent in 1988. It also provides that the reductions in the prevailing charge shall not reduce the prevailing charge below 75 percent of the weighted national average of charges for the service. In localities where the prevailing charge for a service is at or below 75 percent of the weighted national average of charges for that service, the surgeons are not subject to this express fee cap. However, while in such localities OBRA–86 exempts cataract surgeons from the stricter reductions required by § 9334(a)(3), HHS has interpreted OBRA–86 to impose the more general restrictions set forth in § 9331.

Plaintiffs contend that in requiring that both provisions be applied to non-participating cataract surgeons, defendants: (1) violated rulemaking procedures mandated by the Administrative Procedure Act (APA) because HHS promulgated a substantive rule without proper notice and comment, and (2) acted in an arbitrary and capricious fashion.

Defendants argue that the APA was not violated in that if any rulemaking took place, that rulemaking was "interpretive" and not "substantive" or "legislative" and thus was exempt from the formal notice and comment requirements. Furthermore, defendants claim that such interpretation is clearly in line with the legislative goals and mandates of Congress.

Much has been written on the distinction between "legislative" or "substantive" rulemaking and "interpretive" rulemaking. Generally it is agreed that legislative/substantive rules create law, often in implementing an existing statute, while an interpretive rule advises the public of its construction and the agency's interpretation of new or existing law and announces how the agency believes the statute should be enforced. *See, e.g., Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir.1952); *Pickus v. United States Board of Parole,* 507 F.2d 1107, 1113 (D.C.Cir.1974); *Cabais v. Egger,* 690 F.2d 234, 238 (D.C.Cir.1982); *Whitney v. Heckler,* 780 F.2d 963 (11th Cir.1986); *American Medical Association v. Bowen,* 659 F.Supp. 1143 (N.D.Tex.1987), *vacated on other grounds,* 857 F.2d 267 (1988); *American Hospital Association v. Bowen,* 640 F.Supp. 453 (D.D.C.1986). Unlike legislative/substantive rules, which can only be made after extensive notice and comment as proscribed by § 553 of the APA, 5 U.S.C. § 553, interpretive rules are specifically exempt from the notice and comment requirements. *See id.*

■ HHS determined that both the specific cataract fee limitations and the general fee limitations apply to non-participating cataract surgeons. The OBRA–86 reforms are very complex and complicated. The statute does not specifically designate that both, or just the cataract provisions, should apply to the fees charged by non-participating cataract surgeons. However, it appears clear that HHS interpreted the new fee cap provisions in light of the entire statutory purpose of the OBRA–86 changes and goals, and determined that Congress meant for both provisions to be applied to cataract surgeons. As such, the decision was interpretive rather than legislative. As the Court of Appeals stated in *Citizens To Save Spencer County v. United States*

---

**10.** Section 2306(c) of DEFRA placed a cap upon fees charged by non-participating physicians which prohibited them from charging Medicare patients more than the physician's "actual charge" for the calendar quarter beginning on April 1, 1984. 42 U.S.C. § 1395u(j).

**616**

*Environmental Protection Agency*, 600 F.2d 844, 877 (D.C.Cir.1979):

Such a legal assessment of instructions of Congress ... cannot itself be termed "legislative"; for EPA's assessment in this case created no new law, but merely followed Congress into the administrative abyss that Congress itself had created.

HHS's determination did "not create new law, rights or duties." *American Medical Association v. Heckler*, 606 F.Supp. at 1440. HHS simply stated "what the administrative agency thinks the statute means...." *General Motors*, 742 F.2d at 1565 (*quoting Citizens to Save Spencer County v. EPA*, 600 F.2d at 876 & n. 153). Accordingly, HHS's application of both fee caps was an "interpretive rule."

■ Plaintiffs contend that regardless of the status of the rule, the rule itself is arbitrary and capricious. Agencies are accorded considerable deference in interpreting the purposes of a statute. *See, e.g., Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Griffon v. United States Department of Health and Human Services*, 802 F.2d 146 (5th Cir.1986). The Court may find that HHS's actions were arbitrary and capricious only if: (1) Congress has directly spoken to the issue and HHS's construction runs counter to clear congressional intent; or (2) the construction does not contradict clear Congressional intent, but is sufficiently unreasonable. *Chevron*, 467 U.S. at 837, 104 S.Ct. at 2778; *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1567 (D.C.Cir.1984). The Court finds that HHS's interpretation of the general MAAC fee cap and the specific cataract fee cap provision as complementary, and thus both affecting non-participating cataract surgeons, as opposed to exclusive, was not arbitrary.

## CONCLUSION

The Court finds that plaintiffs have standing to challenge the fee limitations and HHS's interpretation of the statutes. However, the Court does not find that the enactment of the fee limitations violates plaintiffs' constitutional rights, nor does the HHS's interpretation of the interaction between § 9334 and § 9331 violate the APA. Accordingly, the Court grants defendants' motion and dismisses the complaint.