**NEW YORK STATE OPHTHALMOLOGICAL SOCIETY, et al., Appellants,**

v.

**Otis R. BOWEN, Secretary, Health and Human Services.**

**Nos. 87–5057 and 87–5065.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1987.

Decided Aug. 19, 1988.

William A. Dobrovir, with whom Robert L. Baum, Washington, D.C., was on the brief, for appellants.

Peter R. Maier, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and John F. Cordes, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellee. Joel E. Momkin, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellee.

Mark B. Rotenberg was on the brief for amicus curiae, American Academy of Ophthalmology, Inc., uring reversal.

Jack R. Bierig, Chicago, Ill., was on the brief for amicus curiae, American Medical Ass'n, urging reversal.

Before MIKVA and WILLIAMS, Circuit Judges, and GORDON,* Senior District Judge.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

Opinion for the Court filed by Circuit Judge MIKVA.

Concurring Opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

MIKVA, Circuit Judge:

This is a consolidated appeal from a district court judgment for appellee, the Secretary of the Department of Health and Human Services ("HHS"), in a class action brought by individual ophthalmologists, their patients, and two professional associations in New York and California suing on behalf of all ophthalmologists and cataract patients in those states ("appellants"). Appellants challenge the constitutionality of § 9307(c) of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), which adds subsections (k)(1) and (2) to § 1842 of the Social Security Act, 42 U.S.C. § 1395u. These amendments prohibit physicians from billing individuals enrolled in Medicare Part B for services of an assistant cataract surgeon ("CAS") unless those services have been approved by an insurance carrier or designated state Peer Review Organization ("PRO").

The district court denied appellants' motion for a preliminary injunction and granted HHS' motion to dismiss. Appellants seek a permanent injunction to restrain enforcement of these amendments and a declaratory judgment that these provisions interfere with patients' and physicians' constitutional rights. On review, we reject appellants' contention that the statute facially violates patients' and physicians' constitutional right to privacy, and affirm the district court's grant of HHS' motion to dismiss with respect to this challenge. We dismiss appellants' remaining constitutional claims as not presently ripe for review.

## I. BACKGROUND

Cataract surgery involves the removal of a clouded lens from the eye and its replacement with a prosthetic lens. An estimated one million cataract removals are performed annually, most on elderly patients enrolled in Medicare. Consequently, reimbursement for cataract surgery constitutes a substantial expense to the Medicare Part B Program, which reimburses for physicians' services. According to a 1985 audit report conducted by the HHS Inspector General, 1983 expenditures for ophthalmology services by surgeons and assistant surgeons in cataract operations amounted to $822 million and $42 million respectively. About 90 percent of Medicare reimbursement costs for eye surgery were related to cataract surgery. *See* Office of Inspector General, Office of Audit, Department of Health and Human Services, *Review of Medicare Payments for Assistant Surgeon Services During Cataract Surgery* 6 (1985) ("Report"), Joint Appendix ("J.A.") at 43.

In an effort to reduce these costs, the Inspector General reviewed the Medicare reimbursement policies for these services and investigated the use of cataract assistant surgeons nationwide. Before 1987, Medicare reimbursed patients for the use of an assistant surgeon if such use was the "generally accepted procedure among ophthalmologists in the local community." Report at 5, J.A. at 42. The determination of allowability of these services was the responsibility of the carrier in each state, based on the "prevailing practice that exists in that locality." *Id.* The Medicare regulations "[did] not comment upon the issue of the medical necessity for assistant surgeons for these services." *Id.* In his review of cataract surgery in 29 states, the Inspector General found that carriers acting for HHS in at least nine states restricted reimbursement for the services of assistant surgeons in cataract operations. The Report disclosed that the states with "lower ratios of paid assistant surgeon services * * * were states that also had restrictions regarding * * * payment." *Id.* at 6, J.A. at 43. In those locales, trained technicians, resident physicians, and paramedical personnel provided assistance at surgery. Ophthalmologists from those states generally agreed with the carriers that two physicians were unnecessary.

The Inspector General did not cite data demonstrating the relative complication rates or comparative safety of the use of personnel with different levels of training

as assistants. The Report nevertheless concluded that

> in view of the numerous cataract surgeries successfully performed nationwide without the use of assistant surgeons * * * the payment of an assistant surgeon for routine cataract surgery results in unnecessary and ineffective use of Medicare program funds. Individual surgeons' preferences with respect to the use of assistant surgeons notwithstanding, other qualified medical personnel are normally available and routinely used during surgery.

*Id.* at 10, J.A. at 47. The Report recommended that the Health Care Financing Administration ("HCFA") promulgate a national policy for eliminating Medicare coverage for second surgeons in routine cataract operations. It also suggested that HCFA establish a mechanism of prior approval for those cases in which the use of a second surgeon is medically indicated.

Influenced by this report, Congress in 1986 amended the legislation governing the Medicare funding program to regulate the use of assistant surgeons for cataract operations by adding sections 1395y(a)(15) and 1395u(k) to Title 42. Section 1395y(a)(15) provides that Medicare will only reimburse for the services of a CAS if a designated state PRO finds that the patient has a "complicating medical condition." The PROs are charged with the responsibility of formulating procedures to determine which patients shall be approved. *See* 42 U.S.C. § 1320c–3(a)(8). Sections 1395u(k)(1) and (2) provide that any physician who "knowingly and willfully" bills patients enrolled in Medicare Part B for services of an assistant at cataract surgery without prior PRO approval will incur civil sanctions as provided in § 1395u(j)(2), including a fine or disqualification for up to 5 years from participation as a Medicare Part B provider. Congress' decision to penalize physicians charging patients for second surgeons was motivated by the concern that Medicare beneficiaries would be forced to bear the cost of the services that Medicare would no longer reimburse. *See* H.R. Rep. No. 241, 99th Cong., 2d Sess. 42 (1986) U.S.Code Cong. & Admin.News 1986, pp.

42, 620 (bill authorizes sanctions to "ensure that beneficiaries are protected from additional out-of-pocket costs"); *see also* 131 Cong.Rec. 29,831 (1985) (remarks of Rep. Waxman) (describing a bill to "reduce Medicare and Medicaid outlays without harming program beneficiaries").

Enforcement of these amendments was temporarily delayed at the request of Congress to allow the PROs and insurance carriers the opportunity to set up pre-approval programs in accordance with HCFA guidelines. In January 1987, HCFA formulated pre-procedure review guidelines that were to apply to operations performed after March 1, 1987. Designated PROs in both New York and California established criteria for granting approval for assistant surgeons based on "complicating medical conditions."

Appellants sued in district court for a preliminary injunction to prevent the agency from putting the penalty provisions into effect. Appellants' objection was confined to sections 1395u(k)(1) and (2), which they interpreted—without contradiction by HHS —as prohibiting the physician from receiving any payment directly from Medicare patients intended as recompense for a CAS' services. Appellants did not challenge the reimbursement disallowance provision, § 1395y(a)(15). The complaint was framed as a class action, although the class was not certified by the district court prior to granting HHS' motion to dismiss. The district court denied the motion for preliminary injunction and rejected appellants' contention that the statutory scheme violated patients' and physicians' constitutional rights. The court stated that § 9307(c) "does not interfere with plaintiff physicians' right to practice their profession or with plaintiff patients' rights to make decisions regarding their own health care." District Court Order, Mar. 10, 1987, at 1 (citation omitted). The court found the statute rationally related to the legitimate government purpose of "the prohibition of the expenditure of federal funds determined to be medically unnecessary while protecting medicare beneficiaries." *Id.* at 2. The court granted HHS' motion to dis-

miss and ordered that § 9307 go into effect as scheduled.

## II. APPELLANTS' ARGUMENTS ON APPEAL

In their appeal to this court, appellants argue that the statutory scheme penalizing physicians for charging patients enrolled in Medicare for CAS services violates patients' and physicians' constitutional rights of privacy, due process, and association. They assert that the challenged amendments enforce an unconstitutional interference in patient privacy, independence, and autonomy by imposing a penalty on the choice to lessen the dangers of surgery by arranging for and paying an assistant surgeon.

Appellants advance the comprehensive thesis that medical decisions are "core" private decisions. A fundamental tenet of privacy jurisprudence, as it has been applied to other types of personal matters, is that the individual most directly concerned is entitled to make and implement the protected decision autonomously and free from paternalistic government intrusion. *See, e.g., Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (decision to marry); *Moore v. East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (decision to live with extended family members); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (reproductive choice). Appellants argue that the constitutional right to privacy also protects autonomy in making medical decisions.

As an element of this right—as well as of the right of free association—appellants claim that the patient is entitled to decide who shall be involved in determining the care he receives. They claim that a statute forcing the patient to "run the gauntlet" of application for PRO approval violates the right of the patient to determine for himself, or with the advice of his chosen physician, how he shall be treated. Such interference can be justified only by a compelling government interest in protecting life or health. Thus, appellants request relief from the obligation to submit their treatment plan for approval.

In addition, appellants maintain that the right to privacy protects patients' interest in *procuring* the treatment of choice. As an aspect of appellants' asserted privacy interest, this right to obtain treatment does not appear to depend on any proof of the "medical necessity" of the desired service. Although appellants maintain that surgeon-assisted surgery is measurably safer and thus medically necessary to the preservation of sight, they insist that *all* medical treatment decisions are protected from state interference because they are inherently private and peculiarly "personal."

We thus interpret appellants' privacy argument as a facial attack applicable against any statute requiring third-party permission to procure a course of medical treatment—including surgeon-assisted cataract surgery. This theory focuses on the decision-making process as well as access to treatment. Appellants also assert a liberty interest in the procurement of medical treatment necessary to vindicate bodily security. As we read the case law on constitutional liberty and substantive due process, any compromise of a patient's liberty interest must turn on deprivation of treatment *essential* to health and life. Thus, the liberty claim focuses solely on patients' entitlement to a result—access to vital medicine treatment—apart from whether that result can only be obtained with governmental approval.

As we discuss more fully below, to the extent that appellants launch a facial challenge to the amendments mandating PRO interference in a medical determination, their claim sounds in privacy. To the extent they object to denial of access, we think they allege violations of both due process, or "liberty," rights as well as the right to privacy. Our analysis of ripeness, standing, and the merits of appellants' position takes this distinction as its starting point.

## III. UNCONSTITUTIONAL INTERFERENCE

We are met at the outset by HHS' claim that any individual patient can entirely avoid the application requirement or pro-

cure desired treatment despite PRO disapproval by obtaining an assistant surgeon through some method other than the normal one of paying him a fee for his services. For example, HHS suggests that the patient may find a CAS who will participate for free, who will enter into a fee-splitting arrangement with the principal surgeon, or who will provide uncompensated assistance in exchange for his colleague's assistance at a future operation. The patient may seek treatment at a teaching hospital in which an intern or resident assists at cataract surgery at no extra cost. Alternatively, the patient can "choose" to forgo Medicare Part B participation altogether, thus putting his physician beyond the reach of the provisions. The government acknowledges that, because there is no such thing as service-specific partial enrollment in Medicare Part B, the patient can protect his physician from sanctions only by "disenrolling" from Medicare.

Whether patients can put themselves beyond the reach of these amendments by availing themselves of the alternatives outlined by HHS presents a threshold question: whether Medicare's regulation of CAS services threatens to injure the rights that appellants claim are constitutionally protected. We find that the regulatory scheme does impose a burden of significant magnitude on patients' medical choice. A straightforward reading of the statutory language indicates that a patient enrolled in Medicare Part B may not pay for the services of a physician as assistant at his surgery without subjecting his doctor to sanctions. Even a physician who does not participate in Medicare and accept Medicare reimbursement may incur a monetary penalty by billing a Medicare-enrolled patient. Thus, unless a patient relinquishes all Part B benefits by disenrolling from Medicare, he is not free to purchase this needed service. We do not agree that the options the government enumerates mitigate the burden imposed by § 9307(c) on a patient's decision regarding his choice of treatment. The expectation that more than a few patients will be able to avail themselves of these options is unrealistic. As a practical matter, most patients will be faced with the Hobson's choice of foregoing the desired service or relinquishing their Medicare benefits.

Moreover, the type of burden imposed on patients by this scheme, although indirect, would not withstand scrutiny in the context of a recognized constitutional interest. In cases upholding a ban on federal funding of abortion services, the Supreme Court drew an important distinction between upholding a subsidy and imposing a penalty. The Court recognized, as the appellants here acknowledge, that mere "refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity," *Harris v. McRae*, 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 2688 n. 19, 65 L.Ed.2d 784 (1979), because the state is not obliged to remove obstacles "not of its own creation" to the exercise of constitutional rights. *Id.* at 316, 100 S.Ct. at 2688; *see also Maher v. Roe*, 432 U.S. 464, 474–75, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484 (1976). A provision, however, that subjects those who engage in protected activity to an unrelated or collateral sanction—such as deprivation of benefits to which an individual is otherwise entitled—significantly burdens the exercise of rights. As the Court stated in *McRae*, "[a] substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion." 448 U.S. at 317 n. 19, 100 S.Ct. at 2688 n. 19; *see also Maher v. Roe*, 432 U.S. at 474 n. 8, 97 S.Ct. at 2383 n. 8 (citing *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (denial of welfare to those exercising right to travel is analogous to criminal fine and justifies strict scrutiny) and *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 97 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (same)). *See generally* Kreimer, *Allocational Sanctions: The Problem of Negative Rights in a Positive State*, 132 U.Pa.L.Rev. 1293, 1343–47 (1984).

We doubt that a statute requiring an abortion patient to relinquish medical bene-

fits if she is unable to find a physician willing either to work for free or to incur sanctions would pass constitutional muster. By analogy, a provision that, as a practical matter, conditions access to a desired service or exemption from an approval requirement on a patient's "voluntary" decision to give up a valuable benefit is tantamount to a direct penalty imposed on the patient who chooses the service. In sum, if the Constitution protects the right to make and implement the decision whether to procure the services of an assistant surgeon on a physician's advice, then § 9307(c) impermissibly infringes that right absent compelling justification.

Having decided that the statutory scheme at issue significantly impedes appellants' freedom of choice, we must decide whether the choices regulated by § 9307(c) enjoy constitutional protection. Before proceeding with this inquiry, we address HHS' standing and ripeness arguments. Although we find that appellants have standing to mount a pre-enforcement privacy challenge to § 9307(c) and that this challenge is ripe for review, we hold that failure to exhaust administrative procedures makes their "liberty" claim unripe.

## IV. PRELIMINARY ISSUES

### A. *Standing*

■ HHS argues that because no appellant has sought or been denied PRO approval for a second surgeon, neither the patients nor the ophthalmologists have standing to bring this claim. HHS maintains that appellants are unable to demonstrate actual or threatened injury until their applications have received adverse action, because § 9307(c) does not deprive these individuals of any right or liberty if a PRO approves their Medicare reimbursement request. Because physicians' claims of injury derive from those of their patients, physician appellants also cannot claim injury to their due process or associational rights until patients sustain injury.

We disagree that appellant patients, and by extension their physicians, lack standing to pursue this challenge in its current posture. First, we do not agree that appel-

lants' injury on all theories advanced by them accrues only when the sanctions imposed by § 9307(c) come into play—that is, after PRO disapproval. Appellants claim that the third-party approval requirement itself invades their privacy interest. Where there is "a legal right, the requisite injury for standing would be found in an invasion of that right." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 224 n. 14, 94 S.Ct. 2925, 2934 n. 14, 41 L.Ed.2d 706 (1974) (citations omitted). Because no patient in the proposed class of those planning or needing cataract surgery is exempt from the approval requirement, all face imminent constitutional injury if forced to submit to the statutorily mandated procedure.

With respect to any constitutional interests of patients and physicians that are not detrimentally affected until the CAS applications are actually *denied*—such as certain "liberty" interests—it is less clear whether plaintiffs as the class of *all* patients planning cataract surgery have standing to sue, or whether it can now be predicted with certainty that the named representatives " 'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706 (1974)). We need not resolve these aspects of the standing question, however, because we hold that the liberty, or due process, claim that accrues solely upon denial of approval is not ripe for judicial review at the pre-enforcement stage.

### B. *Ripeness*

HHS insists that until appellants have exhausted administrative procedures by submitting CAS requests for PRO approval, this controversy is not ripe for judicial review. HHS analyzes ripeness according to the two-part test of (1) fitness of the issues for judicial determination and (2) hardship to the parties of withholding judicial consideration. *See Abbott Laborato-*

*ries v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967). With respect to the first prong, HHS asserts that review is premature because factual development may aid this court's review, and pre-enforcement judicial review may undermine the integrity of a centralized scheme for administrative review like the one HHS has established for assistant surgeon approval. The agency also points out that exhaustion of PRO procedures may moot many patients' complaints because these patients may be approved. HHS disagrees that postponement of review will cause patients irreparable injury, because appellants face no choice between compliance or defiance until HHS has issued a final action refusing to give approval.

In order to address adequately the preliminary issue of ripeness, we must reiterate the distinction between appellants' privacy arguments and the liberty violation thesis because ripeness analysis reveals important differences in readiness for judicial review was between these grounds for challenge. The injuries of which appellants complain under their privacy and liberty theories accrue at different points of the administrative process mandated by the challenged statutory provisions. Appellants allege that operation of the statute at all stages of the administrative process infringes patients' privacy rights of autonomous decision-making. This facial privacy challenge encompasses not only the patients' claims of violation of rights of privacy and association, but also the physicians' claims on these grounds, which are entirely derivative from the patients'. *See Whalen v. Roe*, 429 U.S. 589, 604 n. 33, 97 S.Ct. 869, 879 n. 33, 51 L.Ed.2d 64 (1977). PRO *disapproval* undermines patients' liberty or "due process" interests in bodily security. This claim depends on actual denial of patients' access to needed treatment. These observations are key to our discussion of the ripeness of appellants' constitutional claims.

### 1. *Ripeness of privacy and association claims*

■ HHS contests the fitness for review of appellants' complaint under the first prong of *Abbott Laboratories* by addressing factors at the intersection of ripeness and exhaustion. The ripeness doctrine focuses on the pragmatic question of the competence of the courts to resolve disputes without further administrative refinement of the issue. *See* 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3532 (2d ed. 1984). A controversy is ripe if further administrative process will not aid in the development of facts needed by the court to decide the question it is asked to consider.

■ Insofar as appellants facially attack the comprehensive approval scheme on privacy grounds, we disagree with HHS' argument that further administrative process will develop the controversy to aid this court's review. The privacy challenge appellants present to the court is a purely legal challenge to a statutory approval requirement *per se*. Further facts will not help the court decide whether the right to privacy protects patients from the requirement to seek permission to go forward with their medical plans. We fail to see what will be learned by waiting until the "agency action or policy in question has assumed either a final or more concrete form." *Better Government Ass'n v. Department of State*, 780 F.2d 86, 92 (D.C.Cir.1986). How the PROs apply the guidelines concerning "complicating medical conditions" or other factors that entitle patients to approval does not bear on whether the PROs should be making this inquiry in the first place. "Because this appeal raises a facial attack on the constitutionality of [a statutory provision] * * * we will never be in a better position to decide the issue." *Whitney v. Heckler*, 780 F.2d 963, 969 n. 6 (11th Cir.) (citations omitted), *cert. denied*, 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986).

The fact that the privacy objection also addresses itself to injury peculiar to those patients who in fact are denied PRO approval does not undermine this claim's ripeness. Even if only a subset of patients may claim a privacy interest in the decision whether to engage a CAS—e.g., because undergoing an operation performed by one surgeon puts them at special risk and

makes their decision particularly "important"—those patients can assert a privacy interest in avoiding the approval requirement at its inception, as well as in obtaining the service. Therefore, the court need not wait to see if these patients are denied approval to determine whether the statute infringes their privacy right. The statutory scheme as a whole clearly applies to them. The court need only determine if the statute implicates a privacy interest for some or all patients covered by it.

■ The doctrine of exhaustion, however, introduces other considerations bearing on this claim's "fitness" for review. The exhaustion requirement stresses both respect for agency prerogatives and principles of judicial economy by seeking to prevent "premature interruption of the administrative process." *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1968). The requirement prevents the "frequent and deliberate flouting of administrative process [that] could weaken the effectiveness of an agency," *id.* at 195, 89 S.Ct. at 1663, and preserves agency autonomy by allowing it to "exercise its discretion or apply its expertise," *id.* at 194, 89 S.Ct. at 1663. Requiring exhaustion also promotes judicial efficiency by "avoiding needless repetition of administrative and judicial factfinding," *Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C.Cir.1984), or by making possible a disposition by the agency that will "obviate the need for judicial decision on this issue," *Randolph–Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 105 (D.C.Cir. 1986).

A number of recent cases in this circuit have addressed the proper application of the exhaustion doctrine to a constitutional challenge to agency process. *See, e.g., Ticor Title Ins. v. Federal Trade Comm'n*, 814 F.2d 731 (D.C.Cir.1987); *Hastings v. Judicial Conference of the United States*, 770 F.2d 1093 (D.C.Cir.1985); *Andrade v. Lauer*, 729 F.2d 1475 (D.C.Cir.1984). Nothing in the panel or concurring opinions in these cases justifies requiring further exhaustion by appellants here. Unlike in *Hastings* and *Ticor* (in which plaintiffs were required to exhaust) and *Andrade* (in which plaintiffs were allowed to go forward with their pure constitutional challenge without further exhaustion), this court's review interrupts no ongoing administrative procedures involving members of the appellant class. Appellant patients sue to avoid certain administrative procedures at the outset. Even if we agreed that PRO approval of an individual patient's application "moots" the controversy as to that patient, further administrative process would not moot the challenge for other patients, because most will be denied.

Moreover, this is not a case where an individual patient's receipt of PRO approval will moot all his constitutional claims. By being forced to submit to PRO review, a patient suffers a discrete violation of his constitutional rights. By contrast, the plaintiffs in *Andrade, Ticor,* and *Hastings* claimed that the agencies seeking to determine plaintiffs' rights did so without constitutional authority. *See, e.g., Hastings*, 770 F.2d at 1099–1103 (federal judge sought to enjoin an investigation of his judicial conduct on the ground, *inter alia*, that the investigative body violated the constitutional principle of separation-of-powers). Unlike our appellants, these plaintiffs were not threatened with irreparable injury of constitutional dimension to their rights simply by being forced to submit to the complained-of-procedures.

Agency action therefore cannot secure the relief appellants here request or protect them from the injury they seek to avoid. In this sense, the administrative remedy is inadequate, *see Randolph–Sheppard*, 795 F.2d at 107 ("the relief [the agency] will provide through its action will not be sufficient to right the wrong"), and exhaustion would be futile. Also, this court has no interest in postponing consideration of the privacy claim to "gain[ ] a better perspective on the exact nature of the administrative process being challenged." *Ticor Title*, 814 F.2d at 743 (Edwards, J., separate opinion). Because appellants maintain that any intrusion at all is intolerable, the court need only know that an outside body seeks to interfere with the doctor-patient relationship. In sum, postponement of review will

serve none of the purposes of the exhaustion doctrine. We hold that the privacy challenge is ripe for this court's review.

### 2. *Ripeness of "liberty" claims*

█ Appellants assert that the "near-absolute" prohibition on Medicare patients' employment of an assistant cataract surgeon is a direct interference with their liberty rights. We express no opinion as to the merits of appellants' claim of violation of liberty rights because we find the issue not currently ripe for review.

Our conclusion that this claim is not ripe depends on our reading of relevant case precedent. We do not purport to address the difficult question of whether regulations of this type can ever give rise to a constitutional violation of liberty rights. We think that appellants' statement of a colorable claim of due process violation depends on showing, at a minimum, that the state's interference with an economic or medical choice has dire personal consequences. Apart from any theoretical difficulties in applying case authority dealing with direct bodily interference in this context, appellants' claim must fail at the outset absent evidence that the challenged regulation restricts access to treatment indispensable to a patient's life, health, or sight in a way that "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952); *see also Garcia v. Miera*, 817 F.2d 650, 653–56 (10th Cir.1987) ("substantive due process" may protect against government action directly resulting in severe injury), *cert. denied*, —— U.S. ——, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980) ("substantive due process is concerned with violation of personal rights of privacy and bodily security of * * * [severe] magnitude * * * disproportionate to the need presented."); *cf. Doe v. Bolton*, 410 U.S. 179, 223, 93 S.Ct. 739, 755, 35 L.Ed.2d 201 (1973) (White, J., dissenting) (suggesting that the right to abortion is constitutionally protected whenever required to avoid "substantial hazards to either life or health"); *Roe v. Wade*, 410 U.S. 113, 173, 93 S.Ct. 705, 737, 35 L.Ed.2d 147 (1973) (Rehnquist, J., dissenting) (even barring strict scrutiny, an abortion statute endangering the life of the mother "would lack a rational relation to a valid state objective").

We think it clear that a claim that turns on whether the statutory scheme operates to endanger patients is not currently ripe for review. We are aware of appellants' allegation that *every* patient, regardless of pre-existing risk factors, is exposed to a significantly greater chance of unforeseen, dangerous complications without a second surgeon. It may be, however, that only certain types of patients incur the significant risk without a second surgeon that constitutes legally cognizable injury. Whether patients at risk of harm are in fact exposed to danger depends on whether the PROs apply the guidelines strictly or leniently. Although the guidelines list criteria for disapproval, it is not possible to glean from the face of the guidelines how each patient will fare. The record indicates that patients in California not meeting the listed criteria may appeal for an individualized review. Thus, patients must at least proceed through the stage of application to the PRO and denial of their claims if a court is to consider fully their due process argument.

We do not think that the hardship to patients incurred by this requirement outweighs the importance of developing the concrete record of enforcement practice indispensable to proper judicial consideration of the issue. Moreover, proceeding through this approval application stage does not present patients with the dilemma of foregoing a benefit or risking sanctions. *See Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 172, 87 S.Ct. 1526, 1529, 18 L.Ed. 2d 704 (1967). Enforcement of § 9307(c) takes place in two stages. Patients can challenge the statute in court after the applications for approval are denied. They need not engage the CAS in defiance of the disapproval before seeking review. Because the hardship of submitting to PRO procedures, which occasions little delay, does not outweigh this court's interest in postponing review, we hold that exhaustion is required.

## V. THE MERITS

■ Having decided that appellants' privacy challenge is ripe for review, we address whether appellants assert constitutional interests infringed by § 9307(c). We disagree that the constitutional right to privacy comprehensively protects all choices made by patients and their physicians or subjects to "strict scrutiny" all government interference with choice of medical treatment. There is no basis under current privacy case law for extending such stringent protection to every decision bearing, however indirectly, on a person's health and physical well-being. Furthermore, the problem of determining what kinds of decisions qualify as "medical decisions" eligible for such protection demonstrates that appellants' contentions provide no manageable constitutional standard.

Appellants place great emphasis on *Roe v. Wade* and its progeny as supporting a comprehensive right of privacy protecting every physician-patient decision. They point to a number of passages in these decisions that speak of a woman's right to seek and follow the advice of her physician without state-mandated intrusion or interference. *See Doe v. Bolton,* 410 U.S. 179, 195–200, 93 S.Ct. 739, 749–51, 35 L.Ed.2d 201 (1973) (striking down hospital committee and second physician approval requirement for abortions as facially invalid); *Planned Parenthood v. Danforth,* 428 U.S. 52, 67–75, 96 S.Ct. 2831, 2840–44, 49 L.Ed.2d 788 (1976) (invalidating spousal and parental consent requirements); *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 2180–2181, 90 L.Ed.2d 779 (1986) (holding that specification of information to be provided to pregnant women unconstitutionally interferes with abortion decision-making). Reliance on these cases is misplaced. The Constitution shelters the medical decision-making process in the context of abortion not because it is "medical," but as a means to the end of free reproductive self-determination or autonomy. Accordingly, the Court has struck down regulations that "plac[e] obstacles in the path of the doctor upon whom [the woman is] entitled to rely for advice in connection with her decision" precisely because those obstacles have an impact "upon the woman's freedom to make a constitutionally protected decision." *Whalen v. Roe,* 429 U.S. at 604–05 n. 33, 97 S.Ct. at 879 n. 33.

This line of cases addressing abortion thus provides no rationale for according heightened constitutional protection to decisions affected by these COBRA amendments. *Roe v. Wade* and its progeny represent an extension of the long-recognized constitutional protection for decision-making in the intimate and personal realms of "marriage, procreation, contraception, family relationships, and child-rearing and education." *Whalen v. Roe,* 429 U.S. at 600 n. 26, 97 S.Ct. at 877 n. 26 (quoting *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976)). Admittedly, the categories of private life the Court deems deserving of constitutional shelter "do not always have easily ascertainable boundaries." *Thornburgh,* 106 S.Ct. at 2184. Nevertheless, a decision by this court to confer privacy protection on all medical determinations, no matter what their nature or consequences, would require us to range far beyond the traditional purview of the Court's privacy jurisprudence.

Appellants would nonetheless have us enlarge the privacy doctrine by taking a broader view of its underpinnings. They note that the Supreme Court has struggled to define the contours of the right to privacy by inquiring into which rights and interests are "fundamental," "deeply rooted in this Nation's history and tradition," and "implicit in a concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut,* 302 U.S. 319, 326, 58 S.Ct. 149, 152, 82 L.Ed. 28 (1937). Appellants insist that a logical extension of these "fundamental" principles warrants privacy protection for all decisions relating to care of health and the fate of one's body, since these matters are as "intimate," "personal," and "fundamental" as the traditional concerns of privacy jurisprudence.

To buttress their thesis, appellants muster scattered cases, arising in disparate legal situations, which speak of a zone of privacy in the patient physician-relationship and which adumbrate, however peripherally, an individual autonomy interest in making decisions affecting the quality of life. *See, e.g., Whalen v. Roe,* 429 U.S. at 600, 97 S.Ct. at 877 (suggesting a constitutional interest in independent decision-making in "matters vital to the care of * * * health"); *Andrews v. Ballard,* 498 F.Supp. 1038 (S.D.Tex.1980) (patients' constitutional privacy interests infringed by statute limiting who may practice acupuncture); *England v. Louisiana State Bd. of Medical Examiners,* 259 F.2d 626, 627 (5th Cir.1958) (with respect to due process challenge to state restrictions on chiropractors, "the state cannot deny to any individual the right to exercise a reasonable choice in the method of treatment of his ills"); *see also Doe v. Bolton,* 410 U.S. 179, 219, 93 S.Ct. 739, 755, 35 L.Ed.2d 201 (1973) (Douglas, J., concurring) (speaking of "the right to care for one's health and person and to seek out a physician of one's own choice" as encompassed by the right of privacy).

Appellants rely in particular on the Supreme Court's decision in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1976), for the proposition that the right of independent decision-making encompasses all medical matters. In that case, the Court upheld the constitutionality of a New York statute requiring the state to keep confidential records of dangerous and restricted drugs prescribed by physicians in the state. In the course of its discussion, the Court restated plaintiffs' argument that a privacy interest in "the making of important decisions independently" might include an interest in "making decisions about matters vital to the care of * * * health." *Whalen,* 429 U.S. at 600, 97 S.Ct. at 877. Because the Court decided that the statutory scheme was insufficiently intrusive to infringe patients' possible privacy interest in confidentiality, the Court did not rule on the merits of plaintiffs' contention. Thus *Whalen* fails to support appellants' thesis that the right to privacy prevents government interference with all medical decisions *per se.*

■ In sum, these decisions do not present a coherent body of law justifying the bold extension of privacy doctrine appellants recommend. There are additional reasons, however, why their arguments must be rejected. At the outset, it is altogether unclear what kinds of decisions appellants mean to include in the vague class of "medical decisions." On the basis of this conception of rights "fundamental to an ordered liberty," appellants would have us accord a dizzying range of decisions the same high degree of solicitude now reserved for first trimester abortions. Without further refinement, this class potentially includes vast areas of personal choice that might bear in some way on health or bodily well-being, covering decisions with dramatic and immediate consequences for life and health as well as those motivated largely by personal taste or preference, convenience, or financial considerations.

Additionally, the "fundamental principles" to which appellants advert do not warrant constitutional shelter for medical decision-making as a generic category. At times, appellants speak of a fundamental interest in preserving health and life. *See, e.g.,* W. Blackstone, *Commentaries* 1:120–41 (1765), reprinted in *The Founders' Constitution* at 390–91 ("[T]he preservation of a man's health from such practices as may prejudice or annoy it * * * are rights to which every man is intitled [sic] * * *.") It is immediately apparent that such a principle cannot justify a blanket right to obtain without any government interference every and any kind of treatment that might be available and that a physician might recommend. Although many medical decisions are ostensibly made to promote health, patients and doctors often choose among more or less equivalent options with largely unknown or unpredictable consequences. Not all choices are *indispensable* to the preservation of health or represent a clearly preferable medical alternative. Thus, even if there is some "right" to protect health, such a right does not protect from

regulatory interference every course of action undertaken by doctor and patient.

We doubt, in addition, that appellant can seek to expand the privacy doctrine on the basis of a general principle that all decisions relating to the disposition of one's body are "fundamental" and may not ordinarily be subject to government interference. Case precedent makes clear that not every decision relating to the body or bodily integrity is sufficiently intimate and personal to merit enhanced protection. For example, the Supreme Court has not recognized that the decision to reject vaccination implicates a "fundamental interest," although bodily invasion and medical treatment are unavoidably involved. *See Jacobsen v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed.2d 643 (1905). In *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Court declined to adopt Justice Douglas' statement in dissent that "[n]o clearer invasion of [the] right of privacy can be imagined than forcible bloodletting of the kind involved here." *Id.* at 779, 86 S.Ct. at 1840 (Douglas, J., dissenting). *See also Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957); Comment, *A Taxonomy of Privacy: Repose, Sanctuary, and Intimate Decision*, 64 Calif.L.Rev. 1447, 1471–73 (1976). In short, there is no basis for demanding strict scrutiny for every government measure involving interference with the body. We conclude that the underlying interests appellants identify as fundamental do not justify special constitutional status for a general category of "medical decisions."

We do not rule out that a particular medical decision with regard to eyesight may, like the choice to terminate early pregnancy, be entitled to constitutional privacy protection. In the case of choosing the number of surgeons participating in a surgical procedure designed to save sight, however, the prerequisite to a successful privacy claim would be a definite showing of medical necessity and the unavailability of equally effective alternative therapy. Without this first step, it seems clear this treatment decision is insufficiently consequential to merit a high level of protection from governmental interference.

On a motion to dismiss by the opposing party, appellants are entitled to all inferences in their favor. In order to withstand a motion to dismiss a claim that privacy protection extends to decisions whether to engage an assistant cataract surgeon, we believe that appellants must, at a minimum, create a genuine issue of material fact as to medical necessity. They have not succeeded in doing this on the record before us, since they offer only unsupported expert opinion. *See Merit Motors v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977); *accord Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985) ("a party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations").

In the Inspector General's Report, HHS asserts that a CAS is often not medically necessary. Although the government offers no scientific or epidemiological "hard data," the Report does reveal that cataract surgery in many states is routinely performed without the assistance of another physician. These data support the government's opinion that a second surgeon is not medically necessary. In opposition to these conclusions, appellants introduce affidavits by interested physicians proclaiming that "two heads are better than one." The affiant physicians list complications that can arise during cataract surgery and baldly assert that only a trained physician can handle these challenges successfully. Without a CAS, these physicians opine, the patient is exposed to a definite, enhanced risk of blindness.

These professions of necessity and anecdotal individual cases fail to qualify as competent factual support for appellants' assertions. Appellants must adduce objective scientific data, such as statistically sound epidemiological studies, demonstrating that surgeon assistance at cataract surgery is indispensable to patient well-being. Moreover, appellants cannot rely on the available data on local practices to support their point. The fact that many ophthalmologists in New York and California routinely operate with a second surgeon is *not* com-

petent proof that a second surgeon is medically necessary. Appellants have thus not created a material issue of fact as to whether the matter of engaging an assistant at cataract surgery rises to this magnitude or has this character for all patients or for any identifiable subgroup of patients. We conclude that the district court properly granted HHS' motion to dismiss this claim on the basis of the evidence presented.

In summary, we affirm the district court's denial of an injunction and dismissal of appellants' claim on the merits with respect to the privacy issues ripe for review as outlined above. We decline to conduct pre-enforcement review of appellants' remaining constitutional contentions and accordingly dismiss them as unripe.

*Judgment accordingly.*

STEPHEN F. WILLIAMS, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's affirmance of the district court's dismissal of the complaint, and in its reliance on the doctrines of exhaustion and ripeness. I write separately to express my view that the two doctrines apply to different aspects of the case's prematurity, and to present a somewhat different understanding of the plaintiffs' claim on the merits from that stated by the court.

As the court's opinion explains, plaintiffs —individual ophthalmologists, their patients, and two ophthalmological professional organizations—sue the Secretary of Health and Human Services in order to challenge the constitutionality of § 9307(c) of the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. 99–272, 100 Stat. 194, codified at 42 U.S.C.A. § 1395u(k) (Supp.1988). While another portion of the Act restricts *Medicare funding* for an assistant surgeon in a cataract operation to instances where an insurance carrier or peer review organization has approved the use because of "the existence of a complicating medical condition," 42 U.S.C.A. § 1395y(a)(15) (Supp.1988), the challenged section imposes substantial penalties (fines and ineligibility for Medicare reimbursement) on a doctor who bills *a patient* for services provided without such approval. It thus restricts the ability of a cataract patient to use her *own* money to secure such additional protection as an assistant surgeon might provide. Plaintiffs raise no objection to Congress's decision as to what HHS will reimburse; they attack only the limit on an individual's ability to enter into private arrangements—free of any expense to the government—to employ extra services that would (arguably) reduce the risks of losing his or her eyesight.

I

Exhaustion and ripeness advance substantially identical interests: (1) judicial economy (the proceedings before the agency may give the plaintiffs victory and thus moot the dispute); (2) agency autonomy (the agency's proceedings permit it to develop both a factual record and its own understanding and articulation of the issues); and (3) the proper functioning of the judiciary (judicial non-involvement until the conclusion of agency proceedings prevents the courts from becoming entangled in "abstract disagreements over administrative policies" unfit for judicial review). *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). See also *McKart v. United States*, 395 U.S. 185, 193–94, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969) (reviewing purposes of exhaustion doctrine); *American Trucking Ass'ns v. ICC*, 747 F.2d 787, 789–90 (D.C.Cir.1984) (ripeness). The clearest (and perhaps the only) difference between the doctrines is that exhaustion addresses the *plaintiff's* failure to employ available avenues of administrative relief, while ripeness addresses the status of *agency* activity, namely, the extent to which it has actually enforced its policies.

The two doctrines in this case apply to different features of prematurity. Exhaustion is relevant to the absence of any evidence in the record that any plaintiff has applied for authorization to use an assistant surgeon and been denied. Ripeness applies to the failure of HHS (so far as appears) to impose § 1395u(k) penalties on

any doctor for billing a patient for the services of an unapproved assistant surgeon.

Exhaustion first. Because the record contains no evidence of a denied application for carrier or PRO approval, we have some uncertainty as to how restrictive the carriers and PROs may be. See Maj.Op. at 1388. A clearer picture of the severity of the challenged statute would aid judicial review: the more stringent the PROs and carriers, the heavier the burden imposed by the statute on the plaintiff patients' ability to use their own resources to protect their health.

In all candor, however, I think we should acknowledge that the rejection of a few applications will shed only a dim light on the issues here. Standing alone, one denied application would satisfy the exhaustion requirement, but it would mark out merely one point in the border between the accepted and the rejected; it would not define the border. More specifically, 42 U.S.C.A. § 1395y(a)(15) itself makes clear that carriers and PROs are not to authorize a second surgeon in the absence of a "complicating medical condition," i.e., some *special* indicator that an assistant surgeon's help would be useful. Thus complete exhaustion cannot significantly close the gap between the parties; 42 U.S.C.A. § 1395y(a)(15) appears to preclude the defendant from accepting in the slightest degree plaintiffs' belief that the presence of an assistant surgeon is always a wise precaution, even in the absence of any specific indicators. Accordingly, I believe that the case for requiring exhaustion is marginal.

Ripeness, as I have said, is implicated by HHS's having so far not enforced 42 U.S.C. A. § 1395u(k) against any doctors. The statute imposes the penalties when a doctor "bills" a Medicare patient for the services of an unapproved assistant surgeon. As the court notes, the stated purpose is to protect beneficiaries from additional out-of-pocket costs. Maj.Op. at 1382 (citing legislative history). This leaves various possible interpretations, and under *Chevron U.S.A. Inc. c. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), of course,

we would owe considerable deference to HHS's choice. For example, a patient who pays the doctor before the operation, without having ever been "billed," will necessarily have confronted the choice in a starker, more concrete way than one who responds to billing after the operation. If the pre-paying patient has also been informed that the carrier's or PRO's denial of approval manifests his government's considered judgment that under the circumstances the expense is a waste (either in the sense of not being worth the cost, or perhaps in the stronger sense of not being worth anything), penalties hardly seem necessary to advance consumer-protection interests as they are normally conceived.

The closest HHS has come to passing on this issue takes the form of a statement of Thomas G. Morford, acting director of HHS's Health Standards and Quality Bureau, and Richard P. Kusserow, inspector general. The statement took the form of a question and answer published in *Argus*, a newsletter for ophthalmologists, in September 1986:

> Will Medicare patients have the freedom of choice to pay for a second surgeon?
>
> As we read the statute, it does not appear to exclude voluntary payment from the scope of the prohibition. Presumably, Congress was aware that patients are not usually in a position to disagree with the advice of their physicians, so that it would be impossible to determine whether a patient's decision was indeed "voluntary."

Plaintiffs' Exhibit 2.

The statement leaves obscure to what extent the authors intend the second sentence to undermine the message of the first. (Nor does the record clearly indicate their authority to speak for HHS.) At least a possible construction would be that the penalties do not apply to a doctor who received payment from a patient (1) who was never billed (thus escaping the literal language of § 1395u(k), (2) who paid in advance, and (3) who received full disclosure of the sort suggested above. So interpreted, the statute would impose a far less

severe burden on plaintiffs' interests than if it were read as universally banning payments. Accordingly, because there has been neither enforcement nor any other authoritative indication of HHS's detailed intentions as to the application of § 1395u(k), adjudication now risks precisely the entanglement in indeterminate administrative policy decisions that the ripeness requirement is designed to prevent.

Plaintiffs invoke *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973), in which the Court allowed pre-enforcement review of Georgia's anti-abortion statute at the behest of physicians. But there the Court perceived no ambiguity in the statute that had a potential for altering the outcome of the constitutional issue. (I put aside the complications entailed by *Doe's* involving enforcement of a state criminal statute.) Here the unsettled issues of statutory interpretation render plaintiffs' constitutional claim unfit for judicial review.

Even if the issue presented were fit for judicial review, established ripeness law prevents pre-enforcement review unless failure to review would pose a hardship to parties. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967). (For a limited exception, inapplicable here, see *Eagle–Picher Industries, Inc. v. EPA,* 759 F.2d 905 (D.C. Cir.1985).) Such a hardship could occur if a doctor could obtain no authoritative advance reading from the Department as to its view of the statute's application to receipt of money under specific circumstances: the doctor would be required either to forego the transaction or to risk the penalties authorized by § 1395u(k). A hardship for plaintiff patients could flow from this dilemma—inability to find a doctor willing to engage a second surgeon.

Thus, while hardship normally derives from parties' inability to secure a *judicial* hearing, here its primary source would be inability to obtain authoritative *administrative* rulings. But plaintiffs do not claim such rulings are unavailable. *Cf. National Automatic Laundry and Cleaning Council v. Shultz,* 443 F.2d 689 (D.C.Cir.1971)

(authoritative, judicially reviewable advice provided in correspondence between trade association and Federal Wage and Hour Administrator). Accordingly, even if the constitutional issue posed were fit for judicial review, plaintiffs' hardship assertions are weak.

## II

The court finds neither exhaustion nor ripeness a bar to adjudication of what it characterizes as plaintiffs' privacy claim, framed by the court as relating to an "interest in avoiding the approval requirement at its inception, as well as in obtaining the service." Maj.Op. at 1387. The court differentiates this claim from what it characterizes as plaintiffs' assertion of a "liberty" interest "in *procuring* the treatment of choice." Maj.Op. at 1383 (emphasis in original). The court characterizes the first claim, *so articulated,* as posing a "facial" challenge to § 1395u(k), a pure legal issue independent of the stringency of PRO or carrier review, Maj.Op. at 1383, and of the facts regarding the utility of the second surgeon. On this basis it finds the exhaustion and ripeness doctrines satisfied with respect to that claim.

My difficulty is that I do not believe plaintiffs have posed any such claim. So far as I can determine, there is a unified claim, which may best be characterized as resting in the plaintiff patients' interest in autonomy. (*Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and kindred cases employ the term "privacy," but autonomy seems more apt to describe the individual's interest in making those decisions which affect only him or her (plus any others participating voluntarily).) So far as I can determine, this claim is not independent of the facts regarding the possible value of the uses of an assistant surgeon in unapproved situations; I do not understand plaintiffs to claim that they would have a constitutional claim if it were stipulated that a second surgeon contributed no increment in safety whatsoever in the unapproved situations. Nor am I able to perceive any claim independent of the extent of the practical burden imposed by

§ 1395u(k) (as it may prove to be interpreted by HHS). Accordingly, I cannot join the court in carving out any pure legal issue that surmounts exhaustion and ripeness.

The above deals with the court's rejection of a claim that I believe plaintiffs never made. No harm done. But the court's subdivision of plaintiffs' claim has a troubling side effect. It has led the court into a characterization of the remainder of plaintiffs' claim—what I regard as their sole claim—that appears to divest it of its autonomy values. Thus, the court analyzes what it sees as the second or "liberty" claim solely by reference to such cases as *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), involving forcible government invasions of the individual's body, made in the interest of discovering criminal conduct and judged by the Court in terms of whether the government's act "shocks the conscience," *id.* at 172, 72 S.Ct. at 209. See Maj.Op. at 1388. This further leads the court to suggest that plaintiffs could prevail on the issue only by proving that the second surgeon's presence (in unapproved instances) was *"indispensable* to the preservation of health or represent[ed] a clearly preferable medical alternative," *id.* at 1390 (emphasis in original), or that the second surgeon was "a medical necessity," *id.* at 1391, or "medically necessary," *id.*

As exhaustion and ripeness aim to avoid premature judicial pronouncements, we should not get too far into the unaddressed claim. I will follow the majority only a short way into the thicket. § 1395u(k) restricts individuals' ability to decide for themselves the sort of medical care they may select in self-financed transactions with physicians. The *sole* interest asserted in favor of the restriction is the interest in preventing individuals from being harmed by making unwise expenditures of their own money; there is no claim that the presence of a second surgeon ever makes a cataract operation more risky. Thus the state interest is not only paternalistic, but

lies solely in protecting pocketbook interests of the supposed patient beneficiaries.[1]

Let us consider two possible sets of facts: (1) No reasonable person could conclude that the second surgeon *ever* (in the unapproved cases) enhanced the patient's chances of retaining his eyesight. Here, as I've suggested, I believe that even plaintiffs would say they had no claim.

(2) In the unapproved cases the average incremental value of the second surgeon is less than its average cost (about $286 according to plaintiffs), but not necessarily much less. This would certainly explain Congress's unwillingness to provide insurance coverage for such operations. But an individual, fully informed about the costs and potential risk reduction, could reasonably decide to pay the extra amount. Averages, after all, are made up of individual figures, many or most of which deviate from the average. Moreover, the value a person attaches to preservation of eyesight is highly subjective. Suppose her vocation or interests specially depend on sight—an artist (or a lawyer). Or suppose he was very rich, so that the marginal value of the $286 was very slight? Finally, even an individual patient for whom the *expected value* of the second surgeon (i.e., the value of the benefit under each of the various possible eventualities, weighted for the probability of each eventuality) is less than the cost may be willing to retain a second surgeon; he would do so for the same reason that people buy insurance—to reduce the variability of possible outcomes.

If the average value of the second surgeon is less than the cost, it would be hard to characterize the second surgeon as a "medical necessity," but it is far from clear to me that the invasion of individual autonomy would be constitutional. Accepting *arguendo* the majority's view that the Supreme Court will not place a person's ability to preserve her eyesight on the same lofty plane as her ability to abort a fetus, see *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705,

---

**1.** Of course extravagant expenditures on health may in some instances affect health adversely, by foreclosing expenditures on items—higher quality food, shelter, recreation, etc.—that

would have contributed more to the individual's health than the direct expenditure thereon. See generally Aaron Wildavsky, Searching for Safety (1988).

35 L.Ed.2d 147 (1973), I wonder whether the state may prohibit a person from investing \$286 in a health measure merely because its average incremental value is only, say, \$280. What if its average incremental value is \$50?

Nor am I clear, insofar as facts as to the utility of the second surgeon bear upon the constitutional issue, where the burden of proof lies. Normally of course a statute enjoys a presumption of constitutionality, so that one assailing it must establish such facts as may be necessary to undermine that presumption. But see *Doe v. Bolton*, 410 U.S. 179, 195, 93 S.Ct. 739, 749, 35 L.Ed.2d 201 (1973) (invalidating requirement that abortions be performed in a fully licensed hospital, as state failed to establish that only hospitals satisfied its interest in protecting the patient's health).

Clearly the facts may vary with infinite gradations. We have no way of knowing what may be proven by the statistical data for which the court rightly calls. Maj.Op. at 1391. As a society we mandate in some situations the expenditures of billions of dollars per life expected to be saved. See, e.g., John A. Morrall III, A Review of the Record, *Regulation* (Nov/Dec 1986) 25, 30 (citing estimated cost of \$72 *billion* dollars per life saved by proposed formaldehyde regulations). By what criteria could an individual be deemed irrational for wishing to spend \$286 to reduce the risk of losing her eyesight by one-in–100,000? by one-in-a-million? If such an expenditure is not irrational, can Congress obstruct it solely on the basis of an asserted interest in consumer protection? Compare *Rutherford v. United States*, 616 F.2d 455 (10th Cir.1980) (upholding Food and Drug Administration's denial of approval of laetrile as a permissible "new drug" under 21 U.S.C. § 355 (1982), where FDA found insufficient evidence that it would have "the effect it purports or is represented to have"), with *England v. Louisiana State Board of Medical Examiners*, 259 F.2d 626, 627 (5th Cir.1958) (while state may outlaw "witch doctors, voodoo queens, bee stingers, and various other cults which no reasonably intelligent man would choose for the treatment of his ills," chiropractors are entitled to a chance to prove that "a reasonable man might … intelligently choose a chiropractor").

To repeat, I do not pass on these issues. By the same token, I most emphatically do not join the court in its suggestions that plaintiffs' autonomy claim can be validated only if they establish that the presence of the second surgeon in unapproved cases is "necessary."